## OKLAHOMA NATURAL GAS CO. v. COLVERT.

## OKLAHOMA NATURAL GAS CO. v. MURPHREE et al.

### No. 35455.

Supreme Court of Oklahoma.

June 23, 1953.

Rehearing Denied Sept. 15, 1953.

Pinson, Lupardus & Carlson, Tulsa, for plaintiff in error.

Louis A. Fischl and Joseph M. Culp, Ardmore, for defendants in error.

DAVISON, Justice.

On January 4, 1950, fire destroyed a residence and its contents located about one mile from the City of Ardmore, Carter County, Oklahoma. In one action, Julia Ann Colvert, as plaintiff, sought recovery for loss of the house which she owned. In another, her tenants, Charles Murphree, Jr., and Marion L. Murphree, as plaintiffs, sought recovery for loss of their household goods. The common defendant was Oklahoma Natural Gas Company, a corporation, who supplied natural gas to the residence for domestic consumption and whose alleged negligence in that connection caused the fire and the resulting loss. The cases were consolidated for trial and, from verdicts and judgments in favor of all plaintiffs, defendant has perfected this appeal. The parties will be referred to as they appeared in the trial court.

A large, high pressure, natural gas transmission pipe line belonging to the defendant traversed the farm adjoining a rural plot of real estate owned by the plaintiff, Julia Ann Colvert. On the tract were three buildings—the residence rented and occupied by the plaintiffs, Murphree; another residence occupied by the owner, the plaintiff Colvert; and a wash house, used in connection with the Colvert residence. Natural gas for domestic purposes was supplied to the three structures by the defendant from its high pressure transmission line. The proper pressure for gas for domestic purposes is approximately six to seven ounces per square inch. The pressure in the transmission line was from 200 to 300 pounds per square inch. To reduce that pressure to what was required, the transmission line was connected to the common supply line to the buildings through two pressure regulators. The first, called a "Big Joe" regulator, reduced the pressure from that in the transmission line to about twenty pounds per square inch. The second or smaller regulator, into which the gas was fed, reduced that twenty pound pressure to some six to seven ounces per square inch pressure. The gas was fed from there into a meter and thence into the customers' service line.

There was an automatic gas burning hot water heater in each of the three buildings. In addition, the two residences each had several gas stoves installed in them. During the fall of 1949, the defendant had been doing certain repair work on the transmission line, working up until some five weeks prior to January 3, 1950, at which time there was a large hole around the regulators and the pipe running to them. On the evening of that day it had turned very cold and was raining and sleeting. During the few hours preceding bed time the occupants of both houses had to turn the fire down in all their stoves because the pressure had increased and the stoves were being over heated. About two o'clock on the morning of January 4, 1950, the plaintiff Colvert got up and checked the fires again. The blaze was very high in the bathroom heater which was mounted in the wall and the flames were coming out the top. The pilot light under the hot water heater "was a big flame and was making a lot of noise." She turned the bathroom heater as low as she could. At five o'clock she was up again and the blaze in the bathroom heater was high again. At that time it was turned off.

In the Murphree house almost the same thing occurred. Sometime during the night Mr. Murphree got up and the flames were coming out of the top of the small heater in the kitchen and out of the circulator in the living room. He turned both of them down very low. His wife was also up at that time. They went back to bed. Between five and six o'clock they were awakened by Mrs. Murphree's mother. The fire in the living room was high again, the pilot light fixture on the cook stove was glowing hot and a roaring was coming from the closet housing the hot water heater. Mr. Murphree opened the closet door and flames burst out. They were coming from around the bottom of the heater and going to the top of the closet. He did what he could to extinguish the fire, but could not, and the house and contents were consumed.

Separate actions were filed by the plaintiffs on August 2, 1950, which were consolidated and tried to a jury in October, 1951, resulting in verdicts for the plaintiffs—$3,000 for the Murphrees—$3,000 for Mrs. Colvert. Judgments based thereon have been brought here for review. Although presented under three propositions, defendant seeks reversal of the judgments because of insufficiency of the evidence to support them.

Defendant produced two witnesses who were employees and experts on gas pressure regulators. Neither could determine the cause of excessive blazes in the stoves and heaters but both agreed that an increase in the gas pressure at the appliances could result only from an imperfectly operating regulator. Neither they nor defendant's district sales manager, who was also a witness, would deny that the fire was caused by an excessive and dangerous supply of gas.

The record discloses that the temperature fell from a high of 75 degrees on January 3rd to a low of 11 degrees at 7:00 o'clock on the morning of the 4th. Also, it shows that the gas pressure in the transmission line was gradually increased from 193 pounds at 9:00 o'clock in the evening of January 3rd to a high of 250 pounds at 5:00 o'clock the next morning. This increase in pressure in the transmission line parallels the increased pressure in the service line to plaintiffs' appliances. It was the plaintiffs' theory that improper operation or defective condition of the regulators caused the variation of pressure in the service line and the testimony of defendant's expert witnesses substantiated that position.

The regulators were installed in 1947 and were the most satisfactory that could be obtained. They were not inspected thereafter until subsequent to the fire. No defects or faults could be found in them or their operation. The testimony of Mr. Murphree was to the effect that he went to the regulators a short time after the fire; that the hole around the pipe under them was partly filled with water and sleet and that the loose dirt from the hole had been piled up around it. It was plaintiffs' theory that something had caused the regulators or one of them to temporarily stick, whether it was dust or a pebble or bits of sleet. If the regulators did stick it would account for a higher pressure in the service line and in the stoves. It is unquestioned that something caused the flames in all the stoves in both houses to materially increase during the entire night. No other conclusion can be logically reached but that the fire started from too high a blaze under the hot water tank; that the flame there was the only one which the plaintiffs could not or did not turn down during the night; that the height of the flame at that place was entirely dependent upon the gas pressure in the service line; that the proper pressure in the service line was dependent upon the proper operation of the pressure regulators. We now come to the gist of this lawsuit. When the defendant gradually but materially increased the gas pressure at the input side of the regulators, at a time when the atmospheric temperature was rapidly falling below the freezing mark, what vigilance and degree of care was necessary on its part to assume a normal level pressure of gas in plaintiffs' service line connected to the outlet side of the regulators?

■ Natural gas is a dangerous commodity and a distributor of it is required to exercise a degree of care commensurate with the dangerous character of that which he is handling. In the case of Oklahoma Natural Gas Co. v. Courtney, 182 Okl. 582, 79 P.2d 235, 241, this court quoted the rules applicable to such duty as follows:

"In the case of City of Marlow v. Parker, 177 Okl. 537, 60 P.2d 1044, it is said: 'Whoever uses a highly destructive agency, such as electricity, is held to a correspondingly high degree of care. Care in this sense may mean more than mere mechanical skill; it includes circumspection and foresight with regard to reasonably probable contingencies.'

"See, also, 45 C.J. 847: 'One who deals with an article which is imminently dangerous owes a public duty to all to whom it may come and who may be endangered thereby to exercise caution adequate to the peril involved,

as for example, in giving notice of its dangerous character, and there need be no privity between him and the person injured.' "

These statements are in harmony with the rule as stated in the earlier case of Bellevue Gas & Oil Co. v. Carr, 61 Okl. 290, 161 P. 203, 204, to-wit:

"While not an insurer against unforeseen and unavoidable accidents, yet a company using the public ways of a municipality for its gas pipes in conducting its business is required to exercise the highest degree of care, and to maintain its pipes and other appliances in the best possible condition to render its business safe, and is required to use a degree of care, caution, and circumspection in keeping with the dangerous character of its business."

In the case at bar, it should have been readily apparent to the defendant that on the night in question, the plaintiffs would be using gas in a number of stoves and appliances and that the hot water heater would be burning a greater part of the time when the outside temperature was down to ten to fifteen degrees; that a higher pressure would be produced in the service line when the pressure in the transmission line was increased unless the regulators were operating properly; that snow, sleet and freezing rain might cause the regulators to function improperly if they were not properly shielded against the elements; that if the pressure in the service line increased at the time defendant increased the pressure in the transmission line, it would be at that time of night when the customers were asleep and unmindful of any danger. All of these facts were probably considered by the jury in reaching a verdict.

So well established, that citation of authority is unnecessary, is the rule that where different conculsions may be drawn from the evidence, existence of negligence and question of proximate cause of loss or damage are questions to be determined by the trier of the facts. Defendant argues that it had discharged its duty to plaintiffs when it installed regulators of standard type of the highest safety and tested at time of installation, and that use of such regulators for a reasonable period of time without inspection cannot be the predicate of negligence. However, the facts surrounding the occurrence of the fire in the case at bar raise the question of whether or not defendant, under the circumstances, used that degree of care and precaution required by the situation and the dangerous characteristics of the commodity being handled. Being so raised, the question was one of fact for determination by the jury.

Defendant also contends that the doctrine of res ipsa loquitur cannot be invoked until it is established what thing caused the injury and that such thing was under the exclusive control of the defendant. The facts established by the evidence as outlined hereinabove do not sustain the assertion of the lack of proof of the suggested prerequisites. In the case of Independent Eastern Torpedo Co. v. Gage, 206 Okl. 108, 240 P.2d 1119, 1123, it was pointed out:

"A succinct statement of the rule is, where the circumstances of the occurrence that caused the injury are of a character that give rise to a reasonable inference that if due care had been employed by the party charged with care in the premises, the thing would not have happened, negligence may fairly be inferred in the absence of any explanation."

The facts bring the instant case well within that rule.

The case was properly presented to the jury and its verdict will not be disturbed, being supported by competent evidence.

The judgments are affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and CORN, O'NEAL, and WILLIAMS, JJ., concur.