MOHAWK DRILLING COMPANY, a corporation, Appellant

v.

McCULLOUGH TOOL COMPANY, a corporation, Appellee.

No. 6119.

United States Court of Appeals
Tenth Circuit.

Oct. 7, 1959.

Rehearing Denied Nov. 18, 1959.

Luther Bohanon, Oklahoma City, Okl. (Bert Barefoot, Jr. and Leon S. Hirsh, Oklahoma City, Okl., were with him on the brief), for appellant.

Lynn J. Bullis, Jr., Oklahoma City, Okl. (Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., of counsel, were with him on the brief), for appellee.

Before PHILLIPS, HUXMAN and PICKETT, Circuit Judges.

PHILLIPS, Circuit Judge.

Mohawk Drilling Company [1] brought this action against McCullough Tool Company [2] to recover damages to an oil well of Mohawk, alleged to have been caused by the negligence of McCullough in performing specialized oil well servicing operations with equipment furnished by McCullough.

At the conclusion of Mohawk's testimony, McCullough moved "to dismiss plaintiff's action on the ground that upon the facts and the law the plaintiff has shown no right to any relief." The trial court sustained the motion and entered judgment for McCullough. Mohawk has appealed.

---

1. Hereinafter called Mohawk.

2. Hereinafter called McCullough.

The facts, as shown by admissions in the pleadings and Mohawk's evidence are these:

Mohawk had completed the drilling of an oil and gas well in Oklahoma County, Oklahoma, in November, 1954. Commercial production was obtained in two zones, one known as the Dolemite, the upper horizon, and the other known as the Wilcox, the lower horizon. It was a very good oil and gas well. Production from the two horizons was accomplished by setting two packers in the hole, so that production from the lower horizon passed upward through the tubing and from the upper horizon upward through the casing. After about one year of operation the well required specialized oil well servicing known as "swing jet perforating" to rehabilitate the production therefrom. McCullough was engaged in rendering such services. Mohawk employed it to furnish the equipment and render the service.

The equipment consisted of a truck equipped with a drum, a cable, one end of which was attached to the drum, a pulley attached to the well derrick by a bail, through which pulley the cable moved, and a swing jet gun attached to the other end of the cable. In order to prepare the well for the operation it was necessary to pull the tubing, remove a section that was too small for the gun to pass through, replace it with a larger section of tubing, and then reinsert the tubing into the well through the packers. Mohawk did such preparatory work. McCullough then moved its equipment onto the job.

Before commencing the work McCullough required Mohawk to sign a printed service order form, which read in part as follows:

"To: McCullough Tool Company: In accordance with the General Terms and Conditions shown in your current price list, you are hereby requested to perform work described below and furnish service men to deliver and operate same, under the direction and supervision of the well owner or drilling contractor or his representative for which we promise to pay your charges. As a part of the consideration hereof, it is agreed that the McCullough Tool Company shall not be liable or responsible for any loss, damage or injury to said well resulting from the use of its tools or equipment, or from the acts of any person engaged in doing such work on the described well. It is expressly understood that McCullough Tool Company will not be bound by any agreement, verbal or otherwise, not contained herein or stated in the General Terms and Conditions."

McCullough lowered the gun into the well to the Wilcox zone. 184 shots were made between the depths of 6,482 feet and 6,528 feet, effecting four perforations per foot. The specialized work was carried on under the supervision of Mr. Reeder, district supervisor for McCullough, and Mr. Reed. McCullough's employee operated the drum. After the shots had been made, the equipment became hung in the tubing. McCullough's operators began alternately to pull and release the cable, seeking to work the equipment loose. Both the president of Mohawk, who went to the well site as soon as he learned of the mishap, and another representative of Mohawk repeatedly warned McCullough's operators not to exert so much pull on the cable that it might break. They advised McCullough's operators that other equipment could be procured to cut the cable down in the well and if the cable was broken off in the well, the result would be serious and restoration of the well would entail much trouble and expense. McCullough's operators assured the representatives of Mohawk that the cable would not break; that it would pull out of the head of the gun before enough pull to break it had been applied, and that the cable could stand enough tension to stretch it at least 40 feet.

Notwithstanding the instructions of Mohawk's representatives, McCullough's operators applied so much pull that they

broke the bail to which the pulley was attached, with the result that the pulley and cable fell down on the top of the tubing and broke the cable and the loose end of the cable fell down into the hole.

After the cable broke, McCullough's representatives advised Mohawk that there was nothing more they could do and they left the well site, taking McCullough's equipment with them. After the cable broke, gas began to escape from the hole. Mohawk then undertook to remove the broken cable and the swing gun from the hole. It first used what is known as a center spear. The spear had "little wickers" on the side of it, but the cable was tempered so hard that when it was wrapped over the wickers and force exerted, it broke. Mohawk then decided to pull the tubing out of the lower packer and see if it would loosen the swing gun and cable. However, when it began to pull the tubing, the well began to flow gas and oil, which created a great fire hazard. Mohawk then pumped 60 barrels of salt water into the hole to stop the flow of gas and oil and overcome the fire hazard. Mohawk then pulled up the tubing for a length of three sections thereof and was able to get hold of the upper end of the cable. It then undertook to pull out the cable and swing gun, but the cable broke at a distance of about 200 feet from where it was attached to the swing gun, leaving broken wires and portions of the cable above the lower packer. Mohawk then undertook to get the tubing back into the packers, but was unable so to do. Mohawk then found it necessary to completely kill the well and drill out the lower end of the cable, the swing gun and the packers.

Mohawk expended $30,535.49 in removing the cable, packers and swing gun from the well and putting the well back in production and during the period which it took to restore the well, Mohawk lost oil production of the value of $9,738.96.

■ The first question presented is whether the evidence was sufficient to take the case to the jury on the issue of negligence.

■ Under the Oklahoma decisions the fact that an accident happened and an injury resulted therefrom does not create a presumption of negligence, in the absence of facts and circumstances which warrant the application of the doctrine of res ipsa loquitur.[3]

In Canada Dry Ginger Ale v. Fisher, 201 Okl. 81, 201 P.2d 245, 246, the court said:

"This court has adopted the definition of the original rule of res ipsa loquitur as expressed by Thompson on Negligence, Vol. 8, sec. 7635, pgs. 1022–1224. It is quoted and approved in the case of Carter Oil Co. v. Independent Torpedo Co., 107 Okl. 209, 232 P. 419, 421, wherein many cases from other jurisdictions in harmony therewith are collected and cited. It is as follows:

" ' "Presumption—From the Happening of the Accident. Res Ipsa Loquitur. The rule of 'res ipsa loquitur' is a rule of evidence only. It takes more than the mere happening of an accident to set the rules in operation. It must be shown that the act was of such a character, as, in the light of ordinary experience, it is without explanation, except on the theory of negligence. The thing causing the accident must have been under the control of the defendant or his servant at the time of the accident. The doctrine proceeds on the theory that it is easily within the power of the defendant to show that there was no negligence on his part.

3.  Missouri Pac. R. Co. v. Gordon, 186 Okl. 424, 98 P.2d 39, 41; Soter v. Griesedieck Western Brewery Co., 200 Okl. 302, 193 P.2d 575, 580, 4 A.L.R.2d 458; McAlester Coca-Cola Bottling Co. v. Lynch, Okl., 280 P.2d 466, 471; Bison Transports v. Fraley, 205 Okl. 520, 238 P.2d 835, 838; Kansas, Oklahoma & Gulf Ry. Co. v. Wickliffe, 201 Okl. 129, 202 P.2d 423, 426.

The doctrine is an expression of an exception to the general principle that the negligence charged will not be presumed, but must be affirmatively shown. The presumption is rebuttable, and is overcome by a satisfactory explanation by the defendant. * * * ." ' " 4

In a later case, Southwest Ice & Dairy Products Co. v. Faulkenberry, 203 Okl. 279, 220 P.2d 257, 259, 17 A.L.R.2d 1373, the court stated the rule as follows:

" * * * where the specific act of negligence causing the injury cannot be ascertained or shown by the plaintiff, and where the agencies out of which the negligence arises were within the exclusive control of the defendant, the plaintiff is neither required to allege nor prove any specific act of negligence. In such case, 'where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care.' * * * ." 5

While counsel for Mohawk do not in terms argue that the res ipsa loquitur rule of evidence should be applied in the instant case, they state facts and circumstances disclosed by the record, constituting all of the prerequisites of that rule, and then argue that from those facts and circumstances it should be inferred that the accident was caused by the negligence of McCullough's employees, either in the application of too great a pull on the cable, or in the use of inadequate or defective equipment, so that in substance they do urge the application of the rule.

Here, the equipment and tools being used in the effort to remove the swing jet gun from the casing were under the control and supervision of McCullough's representatives. They had peculiar knowledge of the stress which the tools and equipment would bear without breaking. It is a reasonable inference from the facts that the accident occurred because the bail was inadequate for the purpose for which it was being used, or that the bail was defective and that McCullough knew or was charged with knowledge of such inadequacy or defect, or that McCullough's operators put more than normal tension on the cable and thus more stress on the bail than it was capable of bearing, and in one of such particulars failed to exercise ordinary care under the existing facts and circumstances. Accordingly, we conclude that the doctrine of res ipsa loquitur is applicable.

If McCullough's operators exercised ordinary care and were free from negligence, such facts were peculiarly within the knowledge of McCullough, and it would entail no hardship on McCullough to require it to produce such evidence. The fact that it would be difficult for the plaintiff to establish the facts and that such facts could readily be established by the defendant, the other prerequisites for the rule being present, is one of the reasons underlying the rule, as stated by Thompson in his work on Negligence, Vol. 8, § 7635, quoted with approval by the Supreme Court of Oklahoma in Carter Oil Co. v. Independent Torpedo Co., supra.

In the case of J. C. Penny Co. v. Forrest, 183 Okl. 106, 80 P.2d 640, the Supreme Court of Oklahoma applied the rule in an action by a customer against an owner of a store, where the customer

4. See also: Carter Oil Co. v. Independent Torpedo Co., 107 Okl. 209, 232 P. 419, 421; Ayers v. Amatucci, 206 Okl. 366, 243 P.2d 716, 718.

5. Oklahoma Natural Gas Co. v. Colvert, Okl., 260 P.2d 1076, 1080; Lawton Coca-Cola Bottling Co. v. Shaughnessy, 202 Okl. 610, 216 P.2d 579; Independent Eastern Torpedo Co. v. Gage, 206 Okl. 108, 240 P.2d 1119.

suffered injuries from the falling of a mechanical carrier resulting from the breaking of an iron casting.[6]

Hence, we hold that the evidence was sufficient to take the case to the jury on the issue of negligence.

Counsel for McCullough contend that even if its employees were negligent, their negligence was not the proximate cause of the injury and damage to the well. They assert that the act of Mohawk in breaking the cable when it was undertaking to remove it from the well constituted an intervening cause which broke the chain of causation. They further assert that Mohawk should have cut the cable with a cutting device, instead of attempting to remove it from the well. We think there are obvious answers to McCullough's contention. First, it was necessary to remove the broken cable from the well and Mohawk was simply undertaking to remedy the condition that had been created by McCullough's negligence; second, Mohawk had been assured by the representatives of McCullough that it was perfectly safe to pull on the cable, because before sufficient pull was exerted to break the cable it would break loose from the head of the swing gun and Mohawk was justified in acting on those representations; and, third, the conditions in the well had substantially changed from the time Mohawk suggested that McCullough cut the cable instead of trying to pull the gun and cable out of the tubing, in that the well had begun to produce oil and gas, salt water in large quantities had been forced into the well to stop production, the tubing had been pulled out of the packer, and there were broken strands of the cable in the tubing, so that it is impossible to say on this record that at the time Mohawk was able to secure the upper end of the broken cable, it could have inserted the cutting device into the tubing down to the lower end of the cable. Hence, we conclude that the evidence presented a question for the jury on the issue of proximate cause.

It was the general practice of McCullough and the other companies furnishing the specialized service involved in the instant case to require the signing of a work order or other document containing an exculpatory clause like the one included in the instant case. Unless the well owner was willing to sign such a clause he could not obtain the specialized service.

Here, the bargaining powers of the parties were not equal. McCullough enjoyed much greater bargaining strength than did Mohawk.

The adjudicated cases generally hold that a clause undertaking to exculpate a party from his own negligence will not be sustained where he enjoys a bargaining power superior to that of the other party to the contract.[7]

Such clauses are strictly construed and will not be interpreted to include exemption from negligence, unless an intent so to do is shown by clear, definite and unambiguous language.[8]

Moreover, we are of the opinion that the Supreme Court of Oklahoma would hold a contract attempting to exculpate McCullough from its own negligence, under the circumstances of the instant case, to be contrary to public policy.

In a recent case, Sinclair Refining Co. v. Lang, decided December 17, 1957, and reported in 28 Oklahoma Bar Journal, 1802, the Supreme Court of Oklahoma, in an opinion later withdrawn in conformity with that court's practice to withdraw opinions where the plaintiff in error dismisses the appeal, said:

"In support of the validity of the contractual exculpatory clause ex-

---

6. See also: Billington Lumber Co. v. Cheatham, 181 Okl. 402, 74 P.2d 120.

7. See note, 175 A.L.R. § 6, p. 16; § 9, p. 18, and cases cited §§ 21–35, pp. 38–70, inclusive.

8. Gulf, C. & S. F. Ry. Co. v. Anderson, 120 Okl. 60, 250 P. 500.

empting the company from liability for damages resulting from its negligence, it cites and relies upon Cobb v. Gulf Refining Co. [284 Ky. 523], 145 S.W.2d 96; Govero v. Standard Oil Co., 8 Cir., 192 F.2d 962; Hall v. Sinclair Refining Co. [242 N.C. 707], 89 S.E.2d 396; Sinclair Refining Co. v. Reid [60 Ga.App. 119], 3 S.E.2d 121; Sinclair Refining Co. v. Stevens, 8 Cir., 123 F.2d 186, and Restatement of the Law of Contracts, Secs. 574–575.

"While contracts exempting persons from liability for negligence are not favored by the law and are strictly construed against those relying thereon (see Cases on Contracts, Exemptions for Liability for Negligence, Key 114, Decennial Dig. System), nevertheless, the above cases following the majority rule tend to sustain defendant's contention that a person may effectively bargain against harm caused by his ordinary negligence in the performance of a legal duty arising out of a contractual relation. Hall v. Sinclair Refining Co., 242 N.C. 707, 89 S.E.2d 396, supra. Therein it is said that this general rule rests upon the broad policy of the law which accords to contracting parties freedom to bind themselves as they see fit, subject, however, to the qualification that contractual provisions violative of the law or contrary to some rule of public policy are void and unenforceable.

"But, notwithstanding the above cited authorities, it is pointed out in Hall v. Sinclair Refining Co., supra, that in Griffiths v. [Henry] Broderick, 27 Wash.2d 901, 182 P.2d 18, 175 A.L.R. 1, et seq, will be found a treatise, based on a collation of numerous decided cases from many jurisdictions, which discloses that the trend of modern decision is toward placing further limitations on the general rule which allows contractual exemption from liability for negligence. Such trend of decision derives from a liberalization of the judicial concept of what constitutes sound public policy.

\* \* \* \* \* \*

" \* \* \* We cannot subscribe to the doctrine of exemption by contract against one's own negligence, or approve a public policy which would tend to induce a want of care for the safety of those who by contract, as in the instant case, are required to use equipment furnished by defendant, which when furnished was so negligently installed as to constitute a dangerous instrumentality; which, due to certain hidden defects hereinbefore described, and resulting from the defendant's negligent installation of the equipment, subjected the plaintiff (operator) to personal injuries.

"In accordance with the rule of strict construction, public policy and the trend of modern decision toward further limitations on the general rule which allows contractual exemption from liability for negligence, we hold that under the facts and circumstances in this case the exculpatory clause in the contract was ineffective to exempt Sinclair from liability for damages for personal injuries caused by its admitted negligence."

While the opinion never became the official opinion of the court, we think we are fully justified in giving it consideration in our effort to ascertain the law of Oklahoma with respect to exculpatory contracts.

Reversed and remanded, with instructions to grant Mohawk a new trial.