Harold MARTIN and Louise Martin, Plaintiffs in Error,

v.

FARMERS COOPERATIVE EXCHANGE, a corporation, and Farmers Elevator Mutual Insurance Co., a corporation, Defendants in Error.

No. 39235.

Supreme Court of Oklahoma.

Dec. 19, 1961.

Rehearing Denied Feb. 20, 1962.

W. D. Greenshields, Ponca City, for plaintiffs in error.

Alex Cheek and Sam Hill of Cheek, Cheek & Cheek, Oklahoma City, and Al T. Singletary, Perry, for defendants in error.

BERRY, Justice.

The principal issue presented by this appeal is whether evidence introduced by plaintiffs in error, hereafter referred to as "plaintiffs", showed that defendant in error, Farmers Cooperative Exchange, a corporation, hereafter referred to as "distributor", negligently placed an excessive quantity of propane gas in an above-ground tank used in storing fuel for heating devices in plaintiffs' residence and if its negligence was the proximate cause of the destruction of plaintiffs' residence by fire.

The trial court concluded that plaintiffs' evidence was insufficient to establish the affirmative of the foregoing issue and for said reason entered an order sustaining the demurrer of defendants to plaintiffs' evidence. From order denying plaintiffs' motion for new trial, they perfected this appeal.

The pertinent evidence can be summarized thus:

On January 22, 1959, at approximately 10:30 a. m. the six-room residence of plaintiffs and a portion of its contents were destroyed by fire. The residence was three miles south of Red Rock, Oklahoma.

In 1957, plaintiffs purchased a 500-gallon propane tank which was installed above ground 50 feet from the residence. Plaintiffs also purchased and caused to be installed in the residence two wall heaters.

Distributor furnished all propane used in the residence following installation of the tank and wall heaters. On January 21, 1959, an employee of distributor advised one of the plaintiffs that "you are just about out of propane" at the residence. The plaintiff advised the employee to service the tank. After having done so at approximate-

ly 1:30 p. m. on the same date, the employee stated to Mr. Martin that "you weren't out of gas at all down there, that needle had evidently been stuck or something"; that he was unable to get as much propane in the tank as he originally anticipated.

At the time (1/21/59) the tank was filled with propane, the temperature was between 13 and 15 degrees Fahrenheit. During the afternoon the temperature began to decline and at 9 p. m. the temperature reached 10 degrees and remained near said point until 7 a. m. when it began to rise. At the time of the fire (1/22/59) which occurred on a clear sunny day, the temperature was between 26 and 28 degrees. The temperatures were established by weather data compiled at the Ponca City and Stillwater weather stations. The first referred-to station is less than 21 miles north and east of Red Rock and the last referred-to station is less than 30 miles south and east of Red Rock.

If the temperature was between 13 and 14 degrees at the time the tank was serviced, the maximum gallons of propane that could have been placed therein with safety was 365 gallons. At a temperature of 22 degrees, not more than 394 gallons should have been placed in the tank.

The number of gallons of propane that should be introduced into a tank of given dimensions at a given temperature was set forth in printed rules and regulations promulgated by the State Liquified Petroleum Board. A chart on a gauge (outage gauge) to the tank showed the maximum number of gallons of propane that same would contain with safety at given temperatures. A witness testified that if the chart were followed, not more than 365 gallons of propane should have been placed in the tank when the temperature was between 13 and 14 degrees.

During and following the fire, the outage gauge indicated that at some time more than 500 gallons of propane had been placed in the tank. The gauge would not operate following the fire and thereafter the needle on the gauge showed 540 gallons. Distributor contends that heat from the burning building caused the gauge to register as it did following the fire. While there is evidence that heat will cause propane gas to expand, there is also evidence that the bottom portion of the outage gauge was near the bottom of the tank; that propane in its liquid and not gaseous form would cause the gauge to register. It follows that under the evidence before us the reading of the outage gauge during and following the fire tended to show that more than 500 gallons of propane had been placed in the tank on the day preceding the fire.

From time the tank was filled to time of fire it was estimated that 7½ gallons of propane was used in heating the residence. There was also evidence tending to show that heat from the burning building caused the propane to vaporize; that the pressure of the vapor may have exceeded 250 pounds in which event the "popoff" or safety valve on the tank would open and release vapor, thus further reducing the amount of propane that was placed in the tank on the day preceding the fire. Defendants stipulated that following the fire 415 gallons of propane was drained from the tank. There is evidence that some propane remained in the tank following the drainage operation. In his opening statement to the jury, counsel for defendants stated that on the date preceding the fire, distributor had filled the tank to 90 per cent capacity or 450 gallons.

The evidence fairly shows that the amount of propane placed in the tank by distributor on the day preceding the fire, exceeded the maximum amount that could, with safety, be placed therein under the aforementioned rules and standards of safety recognized and followed by those supplying propane to consumers. There remains for consideration the matter of whether the evidence shows that distributor's negligence in said particular was the proximate cause of the fire and resulting damages.

There was evidence to the effect that heat will cause propane to expand; that if a tank is filled to capacity with propane or if heat causes propane to expand to or near the maximum capacity of the tank, propane

in its liquid state will flow into the line used in flowing fuel to heating devices; that liquid propane will expand 200 times and for said reason 200 times as much gas will reach the burner of heating devices than would reach same if vapor alone entered the distributing line.

The only person in or near the residence at the time the fire started was the 11-year old son of plaintiffs. He testified that he had remained at home the morning of the fire because of illness; that after watching television for a period he went outside the residence and "saw smoke coming all out of that furnace" (heater built in wall of living room); that upon returning to the living room he also saw fire coming out of the vents to the wall heater; that the fire was "all up in it, in the bottom of it and all up in it, and up where it goes to the ceiling"; that he undertook to extinguish the fire with a fire extinguisher.

Harold Martin, plaintiff, testified that upon reaching the residence he noticed the wall heater in the dining room; that there was fire shooting from the heater in that room; that there was "fire at the lower firebox of the furnace, through the bottom"; that "fire was coming out of the top of it"; that the condition of the fire in and around the wall heater in the living room was about the same. Defendants point out that at the time plaintiff reached the home, the fire had progressed to the extent that Mr. Martin would not be in a position to form an opinion as to the point or points in the residence where the fire originated. If plaintiffs made a prima facie case of negligence on distributor's part, this would be a question of fact for the jury.

A person who assisted in attempting to extinguish the fire testified that in doing so he noticed the heater in the living room and that "it was all afire on the bottom, it sounded like a blow torch."

The foregoing evidence tends to show that as a result of distributor placing an excessive amount of propane in the tank, the amount of fuel which reached the burners of the heating devices in the house was such as to cause the fire which destroyed the residence.

In determining whether plaintiffs made a prima facie case, we are guided by the rule that a plaintiff in an action such as this need only make it appear more probable that his damages resulted from the defendant's negligence than from any other cause; that this may be established by circumstantial evidence and reasonable inferences drawn therefrom. Fruechting et al. v. Gilley et al., Okl., 259 P.2d 530; Mealy-Wolfe Drilling Co. et al. v. Lambert, 208 Okl. 624, 256 P.2d 818, and cited cases. If it is so shown, the question of negligence and proximate cause must be left to the jury. Fruechting et al. v. Gilley et al., supra; Oklahoma Natural Gas Co. v. Colvert, Okl., 260 P.2d 1076; Waddle dba Waddle Butane Co. v. Gammel, Okl., 305 P.2d 559; Oklahoma Natural Gas Co. v. Appel, Okl., 266 P.2d 442.

It was stated in Oklahoma Natural Gas Co. v. Colvert, supra [260 P.2d 1079], that "Natural gas is a dangerous commodity and a distributor of it is required to exercise a degree of care commensurate with the dangerous character of that which he is handling."

In Tri-County Gas & Appliance Company et al. v. Charton et al., 229 Ark. 989, 320 S.W.2d 103, the plaintiff sought to recover damages attributable to an explosion and fire which allegedly resulted from defendant's placing more propane in a tank than it was designed to accommodate, thus causing an excessive amount of gas to reach the burners to the stove in a house. In affirming the judgment of the trial court in plaintiff's favor, the appellate court held that under the evidence the question of whether defendant was negligent was for the jury. The court held further that violation of regulations of Arkansas' Liquid Petroleum Gas Board could be considered in determining whether defendant was negligent.

The Court of Appeals of Georgia in Harvey v. Zell, 87 Ga.App. 280, 73 S.E.2d 605, held that allegations of petition to ef-

fect that defendant was negligent in servicing a tank within 5 feet of the plaintiff's home with 93% of the water capacity of the tank in violation of regulations, which negligence resulted in gas escaping through a relief valve of tank into dwelling where it exploded, were sufficient to state a cause of action.

We are of the opinion that under the evidence, the matter of whether distributor was negligent and whether its negligence was the proximate cause of the fire and resulting damages, were questions of fact for the jury. We are, therefore, convinced that the trial court erred in sustaining defendants' demurrer to plaintiffs' evidence.

Since this case may be retried, we will consider the issue of whether the trial court erred in excluding from evidence a report of the administrator for the Liquified Petroleum Gas Division. Following the fire, the administrator visited the premises. He examined the tank, the gauges thereon and talked with a number of witnesses. Following the investigation, the administrator prepared a written report wherein he summarized the facts gathered in making the investigation and stated his opinion as to the cause of the fire which was based in part upon statements made to him by the plaintiffs' son and others who had witnessed the fire. The report was made a part of the administrator's deposition which was introduced in evidence. Upon the deposition being offered in evidence, defendants objected to the report being received in evidence and their objection was sustained. We are of the opinion that the trial court did not err in excluding the report from evidence. See City of Enid v. Reeser, Okl., 330 P.2d 198, and Douvas et al. v. Newcomb et al., Okl., 267 P.2d 600.

Reversed with directions to grant plaintiffs' motion for new trial.

WILLIAMS, C. J., BLACKBIRD, V. C. J., and DAVISON, HALLEY, JOHNSON, JACKSON and IRWIN, JJ., concur.