949 F.2d 1098
 Karen GOODWIN, as Special Administrator of the Estate of
Dianne Dudley Waugh, Deceased, Plaintiff-Appellant,
v.
ENSERCH CORPORATION, d/b/a Lone Star Gas Company, an
operating division of Enserch Corporation,
Defendant-Appellee.
 No. 88-2204.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 26, 1991.
Order on Denial of Rehearing and
Rehearing En Banc March 2, 1992.
 
 Don Manners, Oklahoma City, Okl., for plaintiff-appellant.
 David W. Edmonds, John R. Hargrave and Randy D. Witzke of Edmonds, Cole, Hargrave & Givens, Oklahoma City, Okl., for defendant-appellee.
 Before SETH, HOLLOWAY and BARRETT, Circuit Judges.*
 HOLLOWAY, Circuit Judge.
 
 
 1
 Plaintiff-appellant Karen Goodwin (Goodwin) appeals a judgment entered for defendant-appellee Enserch Corporation (Enserch). This judgment followed the district court's order granting judgment for Enserch notwithstanding the verdict rendered for Goodwin. After the jury verdict in the wrongful death action in favor of Goodwin, the trial judge concluded that she had presented insufficient evidence to support a finding of negligence and granted the judgment n.o.v. The controlling issue in Goodwin's appeal is whether she presented sufficient direct and circumstantial proof to establish a prima facie negligence case, although she did not offer specific testimony on the appropriate conduct for a natural gas pipeline under the circumstances.
 
 
 2
 We are convinced that the trial court erred in granting judgment n.o.v. because Goodwin presented sufficient evidence from which the jury could draw a reasonable inference of negligence, and additional proof on particular conduct required of the defendant Enserch was not mandated. Accordingly, we reverse and remand for entry of judgment on the verdict.
 
 I. BACKGROUND
 
 3
 In February 1987, Dianne Dudley Waugh was living and working at a family tack manufacturing business in southeastern Oklahoma. Waugh recently had moved into a small building that served as the office for the business but that also was equipped and furnished as a living quarters. On February 28, 1987, an early morning fire occurred and there was substantial evidence that it followed a gas explosion; the defendant offered contrary evidence. Although she escaped, Waugh was severely burned. Waugh, age 29, died five days after the fire.
 
 
 4
 As special administrator of her deceased sister's estate, Goodwin filed a wrongful death action in the United States District Court for the Eastern District of Oklahoma. The diversity action named as the defendant the operator of the natural gas pipeline, Enserch, doing business as Lone Star Gas Company (Lone Star). Goodwin's complaint essentially alleged that natural gas leaking from a transmission pipeline that traversed the shop site had caused the explosion and that this resulted from negligence by the defendant in constructing, testing, and inspecting its pipeline. I R.Doc. 2 (First Amended Complaint).
 
 
 5
 During the jury trial, Enserch challenged the sufficiency of Goodwin's evidence. Enserch moved for a directed verdict pursuant to Rule 50(a) of the Federal Rules of Civil Procedure on the ground that Goodwin had not proved negligence. With the Enserch motion for a directed verdict pending, the district judge submitted the case to the jury on Goodwin's negligence theories. He instructed that Goodwin claimed that the gas company was negligent under four theories:
 
 
 6
 One. In failing to construct the pipeline in such manner as to prevent leaks from occurring. Two. In failing to properly test and inspect the line for leaks. Three. In failing to properly test and inspect the [ethyl mercaptan], the odorant in the natural gas. And [f]our. In failing to prevent ethyl mercaptan from dissolving and failing to emit an odor to warn persons of leaks....
 
 
 7
 VI R. 738.
 
 
 8
 The jury returned a verdict in favor of Goodwin and found damages in the amount of $725,000. Accepting the verdict, the district court denied Enserch's pending motion for a directed verdict.[1] Two days before the district court entered judgment, Enserch filed a motion for a judgment n.o.v. pursuant to Rule 50(b). After entering judgment in favor of Goodwin, the trial judge granted the Enserch motion for judgment n.o.v. on the ground that Goodwin had not presented sufficient evidence of the standard of care required of the pipeline. In his order the district judge explained that Goodwin "presented either insufficient or no evidence concerning the duty, or standard of care, to which the defendant should be held in the construction, maintenance and inspection of its pipeline and in the odorization of its gas." I R.Doc. 15, at 4.[2]
 
 
 9
 On appeal, Goodwin contends: that the trial court erred in granting judgment n.o.v.; that sufficient evidence was presented to show a breach of the high standard of care required to prevent the escape of gas, a highly dangerous commodity; that there was evidence to show the explosion was caused by such escape of gas from defendant's pipeline; and that there was evidence of negligence in the construction, testing, and inspection of the pipeline.
 
 II. SUFFICIENCY OF THE PLAINTIFF'S CASE
 A. Standard of Review
 
 10
 Applying the same standard that the trial court applied, we review de novo district court rulings granting or denying judgment notwithstanding the verdict. E.g., Meyers v. Ideal Basic Indus., Inc., 940 F.2d 1379, 1383 (10th Cir.1991); Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). Thus, we test the evidence under the standard " 'whether there is evidence upon which the jury could properly find a verdict for [the party against whom the motion is directed].' " Hurd v. American Hoist & Derrick Co., 734 F.2d 495, 498-99 (10th Cir.1984) (quoting 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 543 (1971)). In determining whether the evidence was sufficient, we apply the substantive Oklahoma law controlling a plaintiff's burden of proving negligence. See, e.g., Meyers, 940 F.2d at 1383. In reviewing the evidence, we must "view the evidence and all inferences in a light most favorable to the nonmoving party," although the nonmovant's position "must be supported by more than a mere scintilla of evidence." Meyers, 940 F.2d at 1383. As instructed by the Supreme Court, in reviewing the application below of Oklahoma substantive law we review the ruling de novo. Salve Regina College v. Russell, --- U.S. ----, ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190, 198 (1991).
 
 
 11
 B. Oklahoma Law Controlling Sufficiency of Evidence of Negligence
 
 1. Prima Facie Proof of Negligence
 
 12
 Because the standard of review specifies a test for sufficiency of proof, we determine whether Goodwin presented a prima facie case of negligence. Under Oklahoma law, a plaintiff presents prima facie proof of negligence by establishing: (1) that the defendant owed a duty to protect the plaintiff from injury or other harm; (2) that the defendant breached, or failed properly to perform, the required duty; and (3) that the defendant's failure to perform the duty proximately caused injury or other harm to the plaintiff. E.g., McKellips v. Saint Francis Hosp., Inc., 741 P.2d 467, 470 (Okla.1987); Thompson v. Presbyterian Hosp., Inc., 652 P.2d 260, 263 (Okla.1982). If Goodwin presented sufficient prima facie proof, then the issue of negligence properly was a question for the jury to resolve. See, e.g., Towery v. Guffey, 358 P.2d 812, 814 (Okla.1960) (reversing directed verdict for defendant because plaintiff established prima facie case of negligence); Julian v. Sinclair Oil & Gas Co., 168 Okl. 192, 32 P.2d 31, 37 (1934) (reversing ruling that plaintiff's evidence was insufficient to go to jury where escaping gas from leaky pipeline caused explosion and resulting personal injuries). A showing by circumstantial evidence is a permissible method of proving breach of duty. See, e.g., Fletcher v. Meadow Gold Co., 472 P.2d 885, 887 (Okla.1970) ("essential elements of negligence are provable by circumstantial evidence"); Safeway Stores, Inc. v. Fuller, 118 P.2d 649, 651 (Okla.1941) ("primary negligence may be established by circumstantial evidence"); see also Nye v. Cox, 440 P.2d 683, 685 (Okla.1968) (explaining plaintiff may establish prima facie case of negligence through circumstantial evidence) (syllabus by the court).
 
 
 13
 2. Legal Duty of Care of Natural Gas Pipelines
 
 
 14
 As the district court instructed the jury, a business that handles natural gas is under a duty to exercise a high degree of care to prevent accidents.[3] The Oklahoma Supreme Court has explained that
 
 
 15
 a higher degree of care and vigilance is required in dealing with natural gas than in the ordinary affairs of life and business, and one who handles such a dangerous agency must use a degree of care to prevent damage from the escaping of gas which is commensurate with the danger which it is its duty to avoid.
 
 
 16
 Margay Oil Corp. v. Jamison, 177 Okl. 433, 59 P.2d 790, 792 (1936) (emphasis added).[4]
 
 
 17
 The standard of care for handlers of natural gas does not contain specific requirements. "While no absolute standard of duty can be prescribed, every reasonable precaution suggested by experience and the known danger of the escape of gas ought to be taken." Oklahoma Gas & Elec. Co. v. Oklahoma Ry., 77 Okl. 290, 188 P. 331, 332 (1920). As the Oklahoma Supreme Court held in Julian v. Sinclair Oil & Gas Co.:
 
 
 18
 The courts have always recognized the known dangerous character of natural gas and have carefully refrained from laying down a rule by which to measure the degree of care and caution to be exercised in the handling of said dangerous substance, and have adopted the policy that those handling natural gas should be required to exercise such a degree of care and caution as is commensurate with its known danger. Whether or not defendant exercised such care is an issue of fact which under proper instructions should be submitted to a jury.
 
 
 19
 32 P.2d at 37 (emphasis added).
 
 
 20
 In light of the evidence reviewed below and these authorities, we are convinced that there was no failure of proof by the plaintiff here. Under the cases, particularly Julian, it is clear that specific evidence of a standard of care resting on the defendant was not required. Indeed, in Julian there is no mention in the court's lengthy opinion of testimony on such a standard of care, and yet the court held the case should have been submitted to the jury. Julian says the courts have "carefully refrained from laying down a rule by which to measure the degree of care and caution" required. 32 P.2d at 37.
 
 
 21
 Moreover, the Oklahoma court has said that "duties arise out of circumstances." Julian, 32 P.2d at 34. Here, Goodwin's proof showed the circumstances giving rise to the pipeline's duty to exercise a high standard of care--defendant's control of a pipeline transporting gas under pressure in the vicinity of a residential structure. Completing the elements of a submissible case, the plaintiff presented evidence of breach of the pipeline's duty, the resulting explosion and damages. As in Julian, the ruling of the trial judge here that the evidence was deficient should be reversed.
 
 III. ANALYSIS OF THE EVIDENCE
 A. Circumstances Surrounding the Fire
 
 22
 The tack manufacturing business where Waugh, the deceased, lived and worked, was operating at the site of a former feed mill five miles south of Hugo, Oklahoma. The office-dwelling that burned was adjacent to a four-lane highway, U.S. 271, at the front of the property. Farther from the highway were barns, silos, and a shop building in which the firm manufactured metal products. The six-inch transmission pipeline, which was carrying 190 pounds per square inch of natural gas, traversed the back of the property at a distance of approximately 460 feet from the office-dwelling in which Waugh lived. IV R. 425; V R. 646; Plaintiff's Ex. 46.
 
 
 23
 When Waugh moved into the office-dwelling[5] a few weeks before the February 28, 1987, tragedy, the natural gas service line leading to the building was not connected. On January 5, Lone Star had attempted unsuccessfully to reinstate gas service to the building. A Lone Star employee had put gas into the line leading to the building, but the gas did not reach the building. The gas company employee explained to Waugh and Goodwin that he could not hook up gas service to the office-dwelling because water was blocking the line and he advised them to have the pipe replaced. After the gas company employee left, Goodwin smelled gas "very strongly"
 
 
 24
 at the meter "riser," the location at which a gas meter would have been installed. II R. 156.[6] Goodwin did not report the odor to the gas company.
 
 
 25
 At approximately 7:30 a.m. on February 28, 1987, a Saturday, Waugh was talking by telephone with a friend, Cynthia F. Harrison. Both women left the line briefly to get cigarettes. At trial, Harrison recounted what occurred when the women resumed their conversation:
 
 
 26
 Diane came back from getting her cigarettes, and I sat back down, and she said, "I'm back." And [her] voice faded away from the phone, as if she turned her head to light her cigarette, and then she started screaming, "Cindy, call somebody. There's a fire." And I wasn't for sure at first what she said to me, and I kept the phone to my ear, and I could hear, sounded like vibrations of her running, and then I knew something was wrong, and she was screaming, "Cindy, call somebody. There's a fire."
 
 
 27
 V R. 639.
 
 
 28
 Phillip A. Rozelle, a motorist on highway 271, noticed the burning building and stopped. He found Waugh attempting to keep warm with a small quilt as she sat on the ground beside the burning building. II R. 86. Rozelle quoted Waugh as saying, "I struck a match and lit a cigarette, and the whole north end of the house blew up." Id. at 87.[7] Waugh told Rozelle she could not understand what had happened; Waugh said that there was no gas service to the building and that she had smelled nothing. Id.
 
 
 29
 Both the Choctaw County sheriff, James Choate, and an agent of the State Fire Marshal, James M. Green,[8] testified that an explosion had occurred. III R. 239-40; IV R. 457. A man and a woman at a mobile home located near the office-dwelling reported hearing "two explosions" before the fire. II R. 85. Further, although the fire consumed the building, witnesses observed objects scattered from approximately 20 to 60 feet away: pieces of insulation; shards of glass; a window screen; the cushion from a day bed; a pen-and-ink sketch of a foal. II R. 84; III R. 232, 239, 269-70, 271; IV R. 424, 428; see III R. 346-47. Having concluded that the unburned cushion could not have been blown through a window, Sheriff Choate decided that the only possible explanation was that an explosion had raised the roof. III R. 239-40. Choate could not determine what sort of explosion it was. Id. at 240.
 
 
 30
 For the defendant pipeline, Bud Beemer, an employee of the Oklahoma Corporation Commission's Pipeline Safety Division, testified that, after finding what he considered neither visible evidence of leaks in the transmission pipeline nor damage consistent with an explosion, he concluded a natural gas explosion did not cause the fire. V R. 646-47, 651-52. This issue went to the jury as a fact question and was apparently resolved against the pipeline.
 
 
 31
 There was evidence of detection of gas in the vicinity of Waugh's office-dwelling just shortly after the accident. On the morning after the fire, the owner of the property, David W. Custer, smelled gas and observed bubbles in a water-filled hole around the gas meter "riser." III R. 271, 272. Two days after the fire, Green, the state fire agent, observed bubbles in the puddle at the meter site appearing at a rate of about 21 per minute, and he smelled an odor of gas in the area. IV R. 442-43.
 
 
 32
 On the day after the fire, a Lone Star crew testing for combustible gas in the ground at the plant site recorded a "slight reading of something" at several places in the vicinity of a driveway approximately 40 feet from the office-dwelling. III R. 290. A Lone Star employee, Billy W. Tullos, observed the readings on an instrument called a combustible gas indicator ("CGI"). Id. at 289-90. A CGI will detect combustible gases including natural gas, methane, and any petroleum product. Id.
 
 
 33
 Between a week and 10 days after the fire, Green conducted additional tests with an instrument that produced evidence of hydrocarbons or flammable materials in three locations at the fire scene. IV R. 443-45. The first location at which he obtained a positive reading on the instrument was a hole located about 40 feet from the building that had been dug after the fire to repair a water line broken by the fire truck. Id. The second location at which Green obtained a positive reading was in the drain area at a water well house located about 129 feet from the office-dwelling. Id. at 425, 445. The third location at which the instrument registered a positive reading was at the gas meter "riser." Id.[9]
 
 
 34
 There was evidence tending to show that Lone Star had been aware of a problem of leaks in the transmission pipeline for some time before the accident. Clamps were used to close off leaks. See IV R. 399. The testimony indicated that leaks in the transmission line in the vicinity of the office-dwelling had been repaired with clamps prior to the fire. Id. at 380-81. A pipeline employee described one of the clamps as a homemade type, used possibly 15 years earlier. See id. at 396.
 
 
 35
 In deciding a negligence case under Oklahoma law, a district court has held:
 
 
 36
 It is a question of fact for the jury (or here the court) as to whether the dangerous condition existed long enough so that in the exercise of ordinary care a reasonable person exercising reasonable care would have discovered and remedied the same. And this may be established by circumstantial as well as by direct evidence.
 
 
 37
 Fleming v. Allied Supermarkets, Inc., 236 F.Supp. 306, 309 (W.D.Okla.1964). Moreover, there was sufficient evidence for an inference of a lack of maintenance of the pipeline to avoid corrosion and leaks so that negligence could be found without prior notice of the leaks. See Stills v. Mayor, 438 P.2d 477, 482 (Okla.1968).
 
 
 38
 On the other hand, there was some defense evidence of no gas leakage. The annual leak survey of the transmission line that Lone Star conducted in April 1987 indicated no gas leakage. III R. 320. Lone Star at the time was conducting leak surveys by having employees walk its pipelines carrying an instrument designed to detect gas above the ground. Id. at 320-21. Federal law required the company to inspect its pipelines annually. Id. at 322. A fact issue was presented for the jury and apparently the jury again found against the defendant pipeline, concluding that gas was present at the time of the accident and was the cause of the explosion.
 
 B. Expert Testimony on Cause of Explosion
 
 39
 Goodwin linked the evidence about gas leaking from the pipeline to the fire through the opinion testimony of an expert witness. Goodwin's expert was Robert Stubbs, a consulting chemist.[10] Stubbs testified that he believed "significant amounts" of the gas leaking from the transmission line migrated underground in the direction of the office-dwelling. IV R. 531.[11] Stubbs said he believed that some of the gas followed the service line from the meter site to the building, and then collected under the slab foundation. Id. Stubbs testified that gas probably entered the building through a joint in the slab foundation and along utility lines. Id. at 531-32.[12]
 
 
 40
 Stubbs concluded that an explosion had preceded the fire. IV R. 497. Stubbs estimated that gas entering the office-dwelling at the rate of 100 cubic feet per hour, or less, could have caused a low-level, or minor, explosion. V R. 555; see id. at 548. Stubbs' testimony suggested that gas could have accumulated undetected in the building because the chemical odorant intended to serve as a warning could have been absorbed by the soil as the gas migrated underground. See IV R. 491-92, 495, 512.
 
 
 41
 Stubbs testified that he believed the holes in the pipeline had existed on the date of the accident. Further, Stubbs said gas probably had been leaking for "several months before the accident." IV R. 504-05. Stubbs concluded that rusting or corrosion of the pipe in the relatively corrosive soil in the vicinity had caused the holes in the transmission line. Id. at 502-03.
 
 IV. CONCLUSION
 As the Supreme Court of Oklahoma has held:
 
 42
 all the plaintiff is required to do in order to establish his case is to make it appear to be more probable that the injury came in whole or in part from the defendant's negligence than from any other cause, and this fact may be established by circumstantial evidence and the reasonable inferences that may be drawn therefrom.
 
 
 43
 Pratt v. Womack, 359 P.2d 223, 225 (Okla.1961) (quoting Covington Coal Prods. Co. v. Stogner, 181 Okl. 35, 72 P.2d 491, 492 (1937) (syllabus by the court)).
 
 
 44
 In light of the substantial evidence supporting plaintiff Goodwin's case, we hold that it was error to grant judgment n.o.v., depriving her of the jury verdict she had won. It is true that there were sharp conflicts in the evidence and that the defendant pipeline presented substantial evidence itself. Nevertheless, those fact questions were submitted to the jury. The instructions under which the jury decided the case are not challenged and they appear to cover adequately a negligence case of this sort in accord with Oklahoma law.
 
 
 45
 It was for the jury to draw inferences from the direct and circumstantial evidence on the basic issues submitted, i.e., whether the circumstances shown created a duty resting on the defendant, whether there was a breach of this duty, and whether there were damages resulting therefrom. The evidence bearing on the circumstances of the operation of the natural gas pipeline in the proximity of the office-dwelling of Waugh was undisputed, and there was substantial evidence of leakage for some time from the defendant's pipeline of the highly dangerous gas, as well as the expert testimony for plaintiff Goodwin, which completed the making of a submissible case for the jury. The placing of a further burden of proof on the plaintiff by the trial judge, and the requirement of further proof of a specific standard of care, are not supported by the Oklahoma cases.
 
 
 46
 Accordingly, the judgment entered notwithstanding the verdict is REVERSED and the cause is REMANDED with directions that the original judgment entered on March 23, 1988, on the verdict for the plaintiff-appellant, be reentered.
 
 ORDER
 March 2, 1992
 
 47
 Before McKAY, Chief Judge, SETH, BARRETT, HOLLOWAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, and EBEL, Circuit Judges.
 
 
 48
 On consideration of the merits of the petition for rehearing, the petition is denied. The assertion that the court relied only on evidence concerning prior knowledge of leaks based on repairs 15 years before the accident is incorrect. Such evidence tends to show long-standing knowledge of leakage, but, in addition, the petition ignores the fact that there was expert testimony, inter alia, that gas had probably been leaking for "several months before the accident." IV R. 504.05. There was expert testimony that there was leaking gas that migrated into the decedent's dwelling and caused the fatal fire. Concluding that there was ample direct and circumstantial evidence, as detailed in the opinion, to support the jury's finding of negligence, we deny the petition for rehearing. See Slip Op. at 13-16.
 
 
 49
 The petition for rehearing with the suggestion for rehearing en banc having been distributed to the hearing panel and the full court, Rule 35(b) Fed.R.App.P., and no judge of the hearing panel and no judge in regular active service on the court having requested a poll, the suggestion for rehearing en banc is denied.
 
 
 50
 The mandate shall issue forthwith.
 
 
 
 *
 After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9(c). The cause is therefore ordered submitted without oral argument
 
 
 [1]
 The district court entered judgment for Goodwin in the amount of $795,414.53, and awarded post-judgment interest. The figure includes a total of $70,414.53 in prejudgment interest
 
 
 [2]
 Summarizing the reasoning underlying the ruling, the district judge wrote: "The limited evidence presented about the condition of defendant's pipeline, and its repair and odorization policies and practices is insufficient to raise any factual issues which the jury could then determine to be negligence on the part of the defendant on the grounds alleged by the plaintiff." I R.Doc. 15, at 12
 
 
 [3]
 Neither party has challenged the district court's instructions to the jury concerning negligence. The district court instructed the jury to apply the ordinary negligence standard: whether the defendant used "due care," or the degree of care that a "reasonably prudent person would have exercised," in proportion to the danger that the natural gas posed. VI R. 740-41. The court charged that "natural gas is a dangerous product, and the defendant is charged with a duty of due care commensurate with such danger." Id. at 740
 
 
 [4]
 See also, e.g., Oklahoma Natural Gas Co. v. Colvert, 260 P.2d 1076, 1079 (Okla.1953) ("Natural gas is a dangerous commodity and a distributor of it is required to exercise a degree of care commensurate with the dangerous character of that which he is handling."); Julian, 32 P.2d at 37 (explaining that "those handling natural gas should be required to exercise such a degree of care and caution as is commensurate with its known danger"); Bellevue Gas & Oil Co. v. Carr, 61 Okl. 290, 161 P. 203, 206 (1916) (explaining handlers of gas must "exercise a high degree of care and caution commensurate with the known or probable dangers" of gas)
 
 
 [5]
 The building was a cinder-block structure with an attached wood frame addition. The cinder-block portion of the building contained a bathroom, rooms used primarily for storage, and a room that Waugh used as a bedroom. The frame addition contained a bathroom and an open office-kitchen-living area
 
 
 [6]
 Witnesses referred to the meter site as the meter "riser." The gas meter site was on the side of the property farthest from the highway. The gas "riser" was approximately 355 feet from the office-dwelling
 
 
 [7]
 Other trial witnesses testified that Waugh related similar accounts of her injuries. Waugh's sister, Goodwin, recalled that at the hospital in nearby Hugo, Oklahoma, the injured woman had explained that "she went to light a cigarette and the whole place blew up." II R. 148-49. An ambulance attendant, Kirk Tryon, testified that during the trip to an Oklahoma City hospital Waugh had said "something about being in the bathroom and lighting a cigarette, and it blew up." Id. at 130
 
 
 [8]
 The record gives Agent Green's qualifications to testify about fires and explosions. As an agent of the State Fire Marshal, Green conducted investigations of the origins of fires at the request of local fire and police departments and others, including individuals and insurers. Prior to becoming an agent of the State Fire Marshal in 1984, Green had been a firefighter, the fire marshal of Idabel, Oklahoma, and a special arson investigator for a district attorney
 
 
 [9]
 There was further evidence bearing on the presence of gas at Waugh's office-dwelling
 In late April or early May 1987, Waugh's mother, Virginia Lee Dudley, began smelling an odor of natural gas in the vicinity of the gas meter "riser." III R. 347-48. Because others in the family did not smell the odor, Dudley did not immediately report it to Lone Star. Id. at 348. However, Dudley continued to smell the gas odor, and she believed it became stronger. Id. at 348-49. In approximately mid-August 1987, Dudley reported the odor to Lone Star. Id. at 349.
 In August 1987, Lone Star crews located and repaired leaks in the natural gas transmission line at four locations. Instruments detected four "grade three" leaks; Lone Star classified leaks in the category as posing no hazard. III R. 323-24. The crew dug the first of four holes at a location near a gas metering station. IV R. 379-80. At the first leak site, a member of the repair crew smelled "a little" gas before the hole was dug. See id. at 380. The crew found that gas was leaking at the first site from two clamps that previously had been installed to repair holes; they tightened one clamp and replaced the other. Id. at 380-81. The second leak site was located a distance of from 40 to 60 feet from the gas meter "riser." See id. at 398. At the second site, the crew replaced a clamp that was leaking gas. Id. at 383-84, 398-99. The third leak site was located near the gas meter "riser." Id. at 386, 399. The crew found and repaired one hole in the pipeline at the third site. Id. at 387-88, 400. At the fourth leak site, the crew repaired a leak by installing a clamp. Id. at 388-89, 400-01. Crew members described the size of the holes in the pipeline as ranging from a pinhead to a pencil lead to a match head. Id. at 392, 398-99.
 A Lone Star crew returned to the shop site later in August 1987 to investigate another report of a natural gas odor. IV R. 403, 406. On a Saturday, a crew stopped a leak by greasing a valve at the meter location. Id. at 404-05.
 
 
 [10]
 At trial, Stubbs identified himself as a consulting chemist who specialized in accidents involving liquefied petroleum gas and natural gas. Stubbs' educational background included his receiving a bachelor of science degree from Iowa State University; his major field of study was chemistry and he was a physics minor. In addition, Stubbs had completed approximately 30 hours of graduate work in chemistry at Loyola University in Chicago. For approximately 13 years, Stubbs was a research and analytical chemist at the Institute of Gas Technology, which is a nonprofit educational and research institute founded by the gas industry. In addition, Stubbs conducted research at the Institute in the field of odorization of natural gases. As a self-employed consultant since 1979, Stubbs' areas of specialty included odorant technology and the investigation of accidents involving gas fires or explosions. Stubbs said he had been involved in the investigations of from "several hundred" to possibly a thousand fires
 
 
 [11]
 Stubbs estimated that gas probably was escaping from each of the smaller holes, which were described as being about the size of a pencil lead, at a rate of more than 300 cubic feet per hour. Under Stubbs' calculations, gas could have been escaping from each of the larger holes, which were described as being about the size of match heads, at a rate of more than 1,300 cubic feet per hour
 
 
 [12]
 Green, the agent of the State Fire Marshal, testified that a Lone Star official told him "that it was possible for gas to migrate underground and come up under concrete slabs and result in an explosion, and that he would assist me in any way possible to [investigate] this explosion." IV R. 476