2007 UT 87

**James Gordon BERRY V, Plaintiff and Appellant,**

v.

**GREATER PARK CITY COMPANY dba Park City Mountain Resort, a Utah corporation; CRE Management, Inc., dba Milosport; and International Ski Federation, Defendants and Appellee.**

No. 20051057.

Supreme Court of Utah.

Oct. 30, 2007.

Harold G. Christensen, Richard A. Van Wagoner, Julianne Blanch, Ryan B. Bell, Salt Lake City, for appellant.

Gordon Strachan, Kevin J. Simon, Park City, for appellee.

NEHRING, Justice:

¶1 James Gordon "V.J." Berry was seriously injured while competing in a ski race. He sued the parties connected with the event, including Park City Mountain Resort (PCMR), the site where the race was held. The district court granted PCMR's motions for summary judgment and dismissed Mr. Berry's claims for ordinary negligence, gross negligence, and common law strict liability. We affirm in part and hold that Mr. Berry's preinjury release of PCMR is enforceable and that the district court properly determined that Mr. Berry's strict liability claim fails as a matter of law. We further hold that the district court improperly awarded PCMR summary judgment on Mr. Berry's gross negligence claim and therefore reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In February 2001, Mr. Berry, an expert skier then twenty-six years of age, entered a skiercross race promoted as the King of the Wasatch, which was constructed on one of PCMR's ski runs. In the skiercross race format, four racers simultaneously descend a course that features difficult turns and tabletop jumps. The racers compete against each other as they ski down the mountain to complete the course first. A series of elimination heats determines the race winner. On Mr. Berry's fourth trip over the course, he attempted to negotiate the course's first tabletop jump. Upon landing from the jump, Mr. Berry fell and fractured his neck, an injury that resulted in permanent paralysis.

¶3 Before being allowed to participate in the contest, competitors like Mr. Berry were required to sign a Release of Liability and Indemnity Agreement. Although Mr. Berry did not read the agreement, he signed it twelve days before the race. The agreement purported to release PCMR from claims arising from its negligence, stating:

> In consideration for being permitted to participate in the Event, I agree to release from any legal liability, agree not to sue and further agree to defend, indemnify and hold harmless Park City Mountain Resort

... the race organizers, sponsors and all of their officers, agents and employees for injury or death resulting from participation in the Event, regardless of the cause, including the negligence of the above referenced parties and their employees or agents.

¶4 PCMR introduced several measures aimed at enhancing the safety of contest participants like Mr. Berry. Blue paint marked the take-off point of the tabletop jumps. The course was built with speed gates and berms uphill of the jump in order to slow and control the speed of racers on their approach. Safety barriers enclosed the racecourse and closed it to noncompetitors. Racers were required to wear helmets and familiarize themselves with the course by inspecting its features while twice "slipping" its length. Competitors were also permitted to take practice runs of the course on the day of the race.

¶5 Naturally occurring conditions compromised these measures on the day of the race. The light was "flat," which hindered depth perception and made it difficult for participants to make out aspects of the course. The snow-covered surface of the course was packed particularly hard.

¶6 Mr. Berry offered expert opinion that pointed to significant design flaws in the tabletop jump that was the site of his fall. For example, the left side of the jump, from which Mr. Berry was forced to ascend due to his competitors' positioning in the heat, was built in a manner to launch skiers at a dangerously steep angle, causing them to be propelled beyond the landing area. Expert opinion also faulted the landing area as being too small and not steep enough to accommodate safe landings.

¶7 Relevant to our purposes, Mr. Berry brought suit against PCMR and alleged claims of ordinary negligence, gross negligence, and common law strict liability. The district court granted PCMR's motions to summarily dismiss each of Mr. Berry's claims. The district court concluded that Mr. Berry was bound by the "clear and unequivocal" language of the agreement and could not therefore pursue a claim against

PCMR based on the resort's alleged negligence. The district court held that Mr. Berry's strict liability claim was invalid because the King of the Wasatch race was not as a matter of law an abnormally dangerous activity. Finally, the district court concluded that as a matter of law Mr. Berry failed to present evidence sufficient to place in dispute the issue of whether PCMR had designed and built the skiercross course with "utter indifference to the consequences that may result" or gross negligence. This appeal followed.

## STANDARD OF REVIEW

■ ¶ 8 Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). Because a grant of summary judgment by definition involves conclusions of law, we afford no deference to the district court's decision and review it for correctness. *See Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 13, 48 P.3d 918.

## ANALYSIS

### I. MR. BERRY'S AGREEMENT TO RELEASE PCMR FROM LIABILITY FOR ITS NEGLIGENT ACTS IS ENFORCEABLE

¶ 9 Preinjury exculpatory releases turn against one another the freedom of persons to regulate their affairs by contract and the social bargain at the heart of tort law that persons who fail to exercise reasonable care should be accountable in damages to those injured by negligent acts. We have not previously had occasion to consider whether the sponsor of a competitive ski race may shield itself from negligence by obtaining prospective exculpatory agreements from participants. This appeal is not, however, our introduction to preinjury releases.

¶ 10 In our most recent encounter, we held that a preinjury release could not foreclose claims of negligence brought by the parent of a minor child who was injured during a guided equestrian trail ride. *Hawkins v. Peart*, 2001 UT 94, 37 P.3d 1062. Mr. Berry interprets *Hawkins* as a case containing sufficient kinetic energy to move it beyond its facts to guide the outcome of this appeal. According to Mr. Berry, *Hawkins* signaled that we had found common cause with a "growing consensus" of jurisdictions that rejected as contrary to public policy preinjury releases generally and those releasing ski areas particularly. To support his interpretation, Mr. Berry drew on our statement in *Hawkins* that

[a]n exculpatory clause that relieves a party from future liability may remove an important incentive to act with reasonable care. These clauses are also routinely imposed in a unilateral manner without any genuine bargaining or opportunity to pay a fee for insurance. The party demanding adherence to an exculpatory clause simply evades the necessity of liability coverage and then shifts the full burden of risk of harm to the other party.

*Id.* ¶ 13.

¶ 11 We made observations critical of preinjury releases in the context of the point that sound reasons exist for the law to treat preinjury releases with greater suspicion than postinjury releases. Regardless of the context in which they appear, we readily acknowledge that the shortcomings of exculpatory clauses cited in *Hawkins* provide ample cause to approach preinjury releases with caution. Indeed, the reasoning used by courts to reject as contrary to public policy preinjury releases is persuasive. *See Hiett v. Lake Barcroft Cmty. Ass'n*, 244 Va. 191, 418 S.E.2d 894 (1992); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1226 (D.C.Cir.2004); *Coughlin v. T.M.H. Int'l Attractions Inc.*, 895 F.Supp. 159 (W.D.Ky. 1995); *Dalury v. S–K–I, Ltd.*, 164 Vt. 329, 670 A.2d 795, 799 (1995); *cf.* N.Y. Gen. Oblig. §§ 5–321 to –326 (2007). In the Commonwealth of Virginia, for example, public policy forbids exculpatory agreements because " 'to hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct ... can never be lawfully done where an enlightened system of jurisprudence prevails.' " *Hiett*, 418 S.E.2d at 896 (quoting *Johnson's Adm'x v. Richmond & Danville R.R. Co.*, 86 Va. 975, 11 S.E. 829, 829 (1890)). This approach is certainly defensible both as a statement of legal and social philosophy—the right to con-

tract is always subordinate to the obligation to stand accountable for one's negligent acts—and on an operational level inasmuch as such a clear statement eliminates any ambiguity over whether a court would later deem a particular preinjury release enforceable. Our recognition of the undesirable features of preinjury releases and of the merits of arguments that we should brand all preinjury releases unenforceable falls short of convincing us that freedom to contract should always yield to the right to recover damages on the basis of another's fault. *See, e.g., Jones v. Dressel,* 623 P.2d 370 (Colo.1981); *Porubiansky v. Emory Univ.,* 156 Ga.App. 602, 275 S.E.2d 163, 167–68 (1980); *Olson v. Molzen,* 558 S.W.2d 429, 431 (Tenn.1977); *Wagenblast v. Odessa Sch. Dist.,* 110 Wash.2d 845, 758 P.2d 968 (1988); *Kyriazis v. Univ. of W. Va.,* 192 W.Va. 60, 450 S.E.2d 649 (1994).

¶ 12 Our analysis in *Hawkins* disclosed both our conviction that a person should retain the power to contract away the right to recover damages for the negligence of another and our understanding that the authority to exercise the right was subject to many conditions and limitations.[1] We began that analysis by acknowledging, uncritically, the "general principle of common law" that " 'those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of contractual duty.' " *Hawkins,* 2001 UT 94, ¶ 9, 37 P.3d 1062 (quoting 6A Arthur Linton Corbin, *Corbin on Contracts* § 1472 (1962)). After canvassing the legal landscape for perspective on how courts have received and interpreted the *Corbin* principle, we noted that most of the cases from jurisdictions that were not among the minority rejecting all preinjury releases focused their analytical energy on ascertaining how to know who is and who is not "engaged in public service." *Id.* ¶ 9. Because it was not necessary to do so, we did not delve into this question in *Hawkins* and instead limited

ourselves to the observation that most jurisdictions that permit prospective releases draw the line at attempts to limit liability for activities in which there is a strong public interest. These cases did not, however, aid us in making progress toward a proper outcome because *Hawkins* concerned the unique circumstance of the release of a minor's prospective claim for negligence and did not implicate the public service exception. Our analysis in *Hawkins* relied, then, on a public policy exception to the *Corbin* principle "specifically relating to releases of a minor's claims." *Id.* ¶ 10.

¶ 13 The lesson of *Hawkins* is that all of the analytical approaches we discussed were exceptions to the general principle that preinjury releases are enforceable. The viability of the principle itself was never challenged. We assumed its controlling force then and make explicit our adoption of the principle now.

■ ¶ 14 Had we intended our observations concerning the deleterious effects of preinjury releases to be our final expression of views on the proper place of such releases in our law, little reason would have existed for us to have refrained from using *Hawkins* to declare categorically that such releases offend public policy and are unenforceable. The proper inference to draw from *Hawkins* is that this general rule is well embedded in our common law despite its flaws. Our position on this matter can coexist with our endorsement of the prevailing view that the law disfavors preinjury exculpatory agreements. *See Hanks v. Powder Ridge Rest. Corp.,* 276 Conn. 314, 885 A.2d 734, 739 (2005).

■ ¶ 15 Having determined that our public policy does not foreclose the opportunity of parties to bargain for the waiver of tort claims based on ordinary negligence, we confront the issues we stopped short of resolving in *Hawkins:* selecting and applying a stan-

---

1. For example, parents in many jurisdictions lack the authority to release a minor's claims against a negligent party. *E.g., Hawkins,* 2001 UT 94, ¶ 10, 37 P.3d 1062. When *Hawkins* was decided, Utah was such a jurisdiction; the state afforded parents no "general unilateral right to compromise or release a child's existing causes of action without court approval or appointment to that effect." *Id.* ¶ 11. Although *Hawkins* involved a mother's preinjury release of her minor daughter's claims, we reasoned that it would be inconsistent for the court to allow parents to do preinjury what they were prohibited from doing postinjury. *Id.*

dard relating to the public interest exception to the general rule recognizing the enforceability of preinjury releases.[2] 2001 UT 94, ¶ 10, 37 P.3d 1062. This is an inquiry that directs our attention to the nature of the activity seeking to be shielded from liability for its negligence and away from *Hawkins'* focus on the status of the person from whom the release is sought.[3] In *Hawkins,* we stated that many states had come to rely on the guidelines for evaluating the applicability of the public interest exception to preinjury releases set out in *Tunkl v. Regents of The University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963). The *Tunkl* guidelines have retained their vitality over the years since Utah, through *Hawkins,* became one of many jurisdictions to permit preinjury releases. *See, e.g., Omni Corp. v. Sonitrol Corp.,* 476 F.Supp.2d 125, 128 (D.Conn.2007); *Am. Structural Composites, Inc. v. Int'l Conference of Bldg. Officials,* 325 F.Supp.2d 1148, 1151 (D.Nev.2004); *Moore v. Hartley Motors, Inc.,* 36 P.3d 628, 632 (Alaska 2001); *Brown v. Soh,* 280 Conn. 494, 909 A.2d 43, 48–51 (2006); *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 141 P.3d 427, 437–39 (2006); *Berlangieri v. Running Elk Corp.,* 134 N.M. 341, 76 P.3d 1098, 1109–10 (2003). The *Tunkl* standard, which identifies the traits of an activity in which an exculpatory provision may be invalid, is as follows:

"[1] [The transaction] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents."

*Hawkins,* 2001 UT 94, ¶ 9 n. 3, 37 P.3d 1062 (quoting *Tunkl,* 32 Cal.Rptr. 33, 383 P.2d at 445–46).

■ ¶ 16 Consideration of these traits is a flexible endeavor; the activity at issue need exhibit only a sufficient number of *Tunkl* characteristics such that one may be convinced of the activity's affinity to the public interest. When a preinjury release is contrary to the public interest, it is invalid. Applying this approach, we test the King of the Wasatch race against each of the six *Tunkl* guidelines.

■ ¶ 17 First, while as an academic matter it may be debatable whether the sport of skiing is of a type generally thought to be suitable for public regulation, in Utah there can be no debate. In Utah, skiing is regulated by the Inherent Risk of Skiing Act, Utah Code Ann. §§ 78-27-51 to -54 (2002 & Supp. 2007). Although the parties assume that the Act applies to skiercross events like the King of the Wasatch race, it is less clear that the applicability of the Act to skiercross racing would qualify the competition as suitable for public regulation. The Act was animated by a legislative finding that "the sport of skiing is practiced by a large number of residents of

---

**2.** The law's wariness of preinjury releases is reflected in the requirement that to be enforceable, such agreements must be communicated in a clear and unequivocal manner. *See Paralift, Inc. v. Superior Court,* 23 Cal.App.4th 748, 29 Cal. Rptr.2d 177, 180 (1993); *Cain v. Banka,* 932 So.2d 575, 578 (Fla.Dist.Ct.App.2006); *Hawkins,* 2001 UT 94, ¶ 5, 37 P.3d 1062. Mr. Berry has not claimed that PCMR's release failed to meet this standard. We therefore limit our discussion of the public interest exception to the general rule that exculpatory agreements are enforceable.

**3.** Of course, the status of the person giving a preinjury release is an omnipresent consideration insofar as status relates to the relative bargaining power of the parties to the release.

Utah and attracts a large number of nonresidents." *Id.* § 78–27–51. The same cannot be said for skiercross racing. This form of competition has simply not generated sufficient public interest either through its popularity or because of hazards associated with it to generate a call for intervention of state regulatory authority. Skiercross racing is but one of an almost countless number of competitive sporting events occurring at any particular time in Utah. Among these, Utah law regulates only competitive boxing and equestrian events. *See id.* §§ 63C–11–301 to –318; *id.* §§ 63C–11–320 to –325; *id.* §§ 78–27b–101 to –102 (Supp.2007).

¶ 18 Thus, while the reach of the Act may extend to ski-related activities that fall outside the public policy considerations underlying the adoption of the Act, those activities, like skiercross racing, are nevertheless subject to a separate analysis for the purpose of evaluating the enforceability of preinjury releases. Put another way, while the services provided by a business operating a recreational ski area and the services provided by a business sponsoring a competitive ski race may be covered by the provisions of the Act, the differences between recreational and competitive skiing are substantial enough to warrant the application of a separate analysis concerning their suitability for public regulation. In our view, skiercross racing is not generally thought suitable for public regulation.

¶ 19 Second, for all the benefits that the King of the Wasatch race may have bestowed on its competitors, sponsors, and spectators, the race sponsors were in no way performing a service of great importance to the public, nor was race participation a matter of practical necessity for anyone.

¶ 20 Third, the record suggests that PCMR made race participation available to anyone who sought to enter. Based on the description of the King of the Wasatch race in the record, a clear inference exists that competitors came from a limited group of expert, competitive skiers.

¶ 21 The fourth *Tunkl* guideline diminishes the likelihood that we might find a preinjury release enforceable considering that the essential nature of the activity or service re-

sults in endowing the party seeking exculpation with a decisive advantage of bargaining strength. We have little doubt that Mr. Berry possessed no bargaining strength whatsoever. If he wanted to compete in the King of the Wasatch race, he was required to sign the preprinted release form. In this setting, however, PCMR's decisive advantage in bargaining strength was of little consequence since the race was a nonessential activity.

¶ 22 Fifth, PCMR's superior bargaining power, its use of a contract of adhesion, and its failure to provide Mr. Berry an option to purchase protection against PCMR's negligence is similarly of little consequence because of the nonessential nature of the race.

¶ 23 The final *Tunkl* factor, that Mr. Berry was placed under PCMR's control as a result of signing the release and made subject to the risk of PCMR's carelessness, is of questionable application. PCMR appears to have been capable of exercising a negligible degree of control over the manner in which Mr. Berry traversed the racecourse or whether he elected to complete the course at all after inspecting its features.

¶ 24 After considering the facts of Mr. Berry's case with the *Tunkl* guidelines in mind, we are convinced that the release Mr. Berry executed in favor of PCMR is enforceable.

## II. THE DISTRICT COURT ERRED WHEN IT AWARDED PCMR SUMMARY JUDGMENT ON MR. BERRY'S GROSS NEGLIGENCE CLAIM

¶ 25 PCMR does not claim that its release insulates it from liability for gross negligence. It argues instead that the precautions the sponsors of the King of the Wasatch race took, designed to minimize the risk of injury to participants without unduly compromising the competitive challenges, without which the contest would have little allure, were sufficient to overcome Mr. Berry's gross negligence claim as a matter of law. Without guidance anywhere in the record as to the applicable standard of care, we cannot conclude that PCMR was not grossly negligent as a matter of law.

¶ 26 We must initially return to the topic of the standard of review because its proper form and application largely determine the outcome of Mr. Berry's challenge to the district court's summary dismissal of his gross negligence claim. In securing recovery, the task confronting a plaintiff who claims injury due to a defendant's gross negligence is markedly greater than that of a plaintiff who traces his injury to ordinary negligence. Gross negligence requires proof of conduct substantially more distant from the appropriate standard of care than does ordinary negligence. We have characterized gross negligence as " 'the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.' " *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 335 (Utah 1985) (quoting *Robinson Ins. & Real Estate, Inc. v. Sw. Bell Tel. Co.*, 366 F.Supp. 307, 311 (W.D.Ark.1973)).

¶ 27 When reviewing appeals from grants of summary judgment in cases of ordinary negligence, we have consistently followed the principle that "summary judgment is generally inappropriate to resolve negligence claims and should be employed 'only in the most clear-cut case.' " *White v. Deseelhorst*, 879 P.2d 1371, 1374 (Utah 1994) (quoting *Ingram v. Salt Lake City*, 733 P.2d 126, 126 (Utah 1987) (per curiam)). Moreover, summary judgment is " 'inappropriate unless the applicable standard of care is fixed by law, and reasonable minds could reach but one conclusion as to the defendant's negligence under the circumstances.' " *White*, 879 P.2d at 1374 (quoting *Wycalis v. Guardian Title of Utah*, 780 P.2d 821, 825 (Utah Ct. App.1989) (internal quotation marks omitted)).

¶ 28 Were we evaluating this case as one of ordinary negligence, we would have little difficulty discerning the presence of genuine issues of material fact sufficient to overcome a motion for summary judgment. Mr. Berry presented testimony of an experienced ski racer, coach, and jumper who witnessed Mr. Berry's accident and faulted the jump's design. A second expert in ski racecourse design and safety was likewise critical of the configuration of the accident site.

¶ 29 According to PCMR, this testimony is insufficient to overcome summary dismissal of Mr. Berry's gross negligence claim because evidence that would be adequate to take an ordinary negligence case to a jury cannot withstand uncontroverted evidence that PCMR exercised enough care to avoid a finding of gross negligence. PCMR urges that its production of evidence indicating that it used "even slight care" or displayed something more than "complete and absolute indifference" to the consequences that might have resulted from an improper design or construction of the tabletop jump and landing area is sufficient to remove Mr. Berry's gross negligence claim from the jury. We disagree.

¶ 30 The parties have not directed us to, nor have we been able to discover, a location in the record where the appropriate standard of care applicable to the design and construction of skiercross courses appears. We have held that where a standard of care is not "fixed by law," the determination of the appropriate standard is a factual issue to be resolved by the finder of fact. *Wycalis*, 780 P.2d at 825. Identification of the proper standard of care is a necessary precondition to assessing the degree to which conduct deviates, if at all, from the standard of care— the core test in any claim of gross negligence. Absent the presence of an identified, applicable standard of care to ground the analysis, we hold that the district court improperly granted PCMR summary judgment and dismissed Mr. Berry's gross negligence claim.

III. THE DISTRICT COURT'S SUMMARY DISMISSAL OF MR. BERRY'S STRICT LIABILITY CLAIM WAS PROPER

¶ 31 Mr. Berry contends that the district court erred when it summarily dismissed his claim that PCMR was strictly liable for damages for his injuries because skiercross racing is an abnormally dangerous activity as defined by the factors set out in section 520 of the Restatement (Second) of Torts. In aid of his argument, Mr. Berry points to numer-

ous articles in popular ski publications, describing in dramatic terms the injuries sustained, seemingly as a matter of routine, by racers in skiercross competitions. These aspects of the record may indeed advance Mr. Berry's cause regarding the degree of peril that skiercross races pose. To us, they establish convincingly alternative grounds upon which to affirm the district court's rejection of Mr. Berry's strict liability claim. *See, e.g., State v. Robison,* 2006 UT 65, ¶ 19, 147 P.3d 448 (allowing affirmance of the judgment appealed from based " 'on any legal ground or theory apparent on the record' "(quoting *Bailey v. Bayles,* 2002 UT 58, ¶ 10, 52 P.3d 1158)).

¶ 32 Assuming the skiercross racing is an abnormally dangerous activity, Mr. Berry's role as a participant excludes him from eligibility to recover under a theory of strict liability. *See, e.g., Pullen v. West,* 278 Kan. 183, 92 P.3d 584 (2004) (holding that an individual who lit fireworks while a guest at an Independence Day party was a participant in an abnormally dangerous activity and therefore barred from recovery on a strict liability theory). As a general principle, the Restatement's protections extend to those individuals who are injured as the result of an activity that carries "the existence of a high degree of risk of some harm to the person, land or chattels of others." Restatement (Second) of Torts § 520 (1977). Like the *Pullen* court and others, we agree that the scope of section 520 excludes participants, like Mr. Berry, who engage in the very activity for which they seek to recover damages based on strict liability. *See, e.g., Whitlock v. Duke Univ.,* 637 F.Supp. 1463, 1475 (M.D.N.C.1986); *Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326, 341 (Ct.App.1978); *Trull v. Carolina–Virginia Well Co.,* 264 N.C. 687, 142 S.E.2d 622, 622–26 (1965). This conclusion is not undermined by the principles upon which Mr. Berry rests his claim to strict liability recovery.

¶ 33 Section 520 generally states that a court should consider the following factors in determining whether an activity is abnormally dangerous:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Mr. Berry argues the eligibility of skiercross racing under several of these. Although we fully recognize that all of these factors may aid a court in evaluating whether an activity is abnormally dangerous, we view the first factor as qualitatively different than the rest and therefore worthy of separate consideration. *See, e.g.,* Restatement (Second) of Torts § 520 cmt. f ("Any one of them is not necessarily sufficient of itself . . . for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily."). Unlike its five colleagues, the first factor targets the very nature of the strict liability protection—who is eligible. Section 520 exposes landowners who conduct abnormally dangerous activities on their land—harboring dangerous animals was of particular concern to the drafters of the Restatement—to strict liability for injury suffered by those who come onto the land under color of privilege, but not for injury suffered by those who participated in the abnormally dangerous activity. We accordingly affirm the district court's dismissal of Mr. Berry's strict liability claim.

**CONCLUSION**

¶ 34 Because our public policy does not foreclose Mr. Berry from waiving PCMR's liability, we hold that Mr. Berry's preinjury release is enforceable. We further hold that Mr. Berry's strict liability claim fails as a matter of law considering his participation in the skiercross race. Finally, we hold that the district court erred in awarding summary judgment on Mr. Berry's gross negligence claim without reference to the applicable

standard of care. We therefore reverse and remand to the district court for proceedings consistent with this opinion.

¶ 35 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.