2007 UT 96

**William ROTHSTEIN, Plaintiff and Appellant,**

v.

**SNOWBIRD CORPORATION, a Utah corporation, Defendant and Appellee.**

No. 20060158.

Supreme Court of Utah.

Dec. 18, 2007.

Jesse C. Trentadue, Salt Lake City, for plaintiff.

Gordon Strachan, Kevin J. Simon, Park City, for defendant.

NEHRING, Justice:

¶ 1 William Rothstein, an expert skier, sustained injuries when he collided with a retaining wall while skiing at Snowbird Ski Resort. He sued Snowbird, claiming the re-

sort's negligence caused his injuries. The district court granted Snowbird's motion for summary judgment and dismissed Mr. Rothstein's ordinary negligence claim. The district court agreed with Snowbird that Mr. Rothstein had surrendered his right to recover damages for Snowbird's ordinary negligence when he became a party to two agreements releasing Snowbird from liability for its acts of negligence. In this appeal, Mr. Rothstein challenges the enforceability of the releases and the district court's summary judgment based on them. We hold that the releases are contrary to the public policy of this state and are, therefore, unenforceable. Accordingly, we vacate the district court's grant of summary judgment in favor of Snowbird.

## BACKGROUND

■ ¶ 2 When we review a district court's grant of summary judgment, as in this case, we review the facts and their reasonable inferences in a manner most favorable to the nonmoving party. *See, e.g., Progressive Cas. Ins. Co. v. Ewart,* 2007 UT 52, ¶ 2, 167 P.3d 1011. We present the facts surrounding Mr. Rothstein's injury in this light.

¶ 3 As he was descending Snowbird's Fluffy Bunny run, Mr. Rothstein collided with a retaining wall constructed of stacked railroad ties and embedded partially in the mountain. The collision left Mr. Rothstein with broken ribs, an injured kidney, a bruised heart, a damaged liver, and a collapsed lung. At the time of the accident, a light layer of snow camouflaged the retaining wall from Mr. Rothstein's view. As photographs and the alleged admission of a resort official suggest, the retaining wall was unmarked and no measures had been taken to alert skiers to its presence. Although Snowbird had placed a rope line with orange flagging near the wall, there remained a large gap between the end of the rope and a tree, which Mr. Rothstein incorrectly understood indicated an entrance to the Fluffy Bunny run. Mr. Rothstein filed suit against Snowbird for its ordinary and gross negligence.[1] Snowbird defended itself by asserting that Mr. Rothstein had waived his ability to sue Snowbird for its ordinary negligence when he purchased two resort passes that released the resort from liability for its ordinary negligence.

¶ 4 At the time he was injured, Mr. Rothstein held a season pass to Snowbird and a Seven Summits Club membership which entitled him to bypass lift lines for faster access to the slopes. In order to obtain these benefits, Mr. Rothstein signed two release and indemnify agreements. The first agreement provided:

> I hereby *waive all of my claims,* including claims for personal injury, death and property damage, against Alta and Snowbird, their agents and employees. I *agree to assume* all risks of personal injury, death or property damage associated with skiing ... or *resulting from the fault of Alta or Snowbird, their agents or employees.* I *agree to hold harmless and indemnify* Alta and Snowbird ... from all of my claims, *including those caused by the negligence or other fault of Alta or Snowbird, their agents and employees*

(emphasis in original). The second agreement stated:

> In consideration of my use of the Snowbird Corporation (Snowbird) ski area and facilities, I agree to *assume and accept all risks of injury to myself and my guests, including the inherent risk of skiing, the risks associated with the operation of the ski area and risks caused by the negligence of Snowbird,* its employees, or agents. I *release and agree to indemnify Snowbird,* all landowners of the ski area, and their employees and agents from all claims for injury or damage arising out of the operation of the ski area or my activities at Snowbird, whether such injury or damage arises from the risks of skiing or from any

---

1. Mr. Rothstein's initial complaint alleged only ordinary negligence. The district court permitted him to amend his complaint to incorporate a gross negligence claim after it had granted Snowbird's motion for summary judgment on Mr. Rothstein's ordinary negligence cause of action.

other cause *including the negligence of Snowbird, its employees and agents* (emphasis in original).

¶ 5 Citing the agreements, the district court granted summary judgment in favor of Snowbird on Mr. Rothstein's ordinary negligence claim. (Mr. Rothstein later voluntarily moved to dismiss his gross negligence claim without prejudice.) The issue before us is whether the district court correctly granted Snowbird summary judgment on Mr. Rothstein's ordinary negligence claim on the basis of the existence of the release and indemnify agreements.

## DISCUSSION

¶ 6 Preinjury releases from liability for one's negligence pit two bedrock legal concepts against one another: the right to order one's relationship with another by contract and the obligation to answer in damages when one injures another by breaching a duty of care. *E.g., Berry v. Greater Park City Co.,* 2007 UT 87, ¶ 12, 171 P.3d 442. We have joined the majority of jurisdictions in permitting people to surrender their rights to recover in tort for the negligence of others. *Id.* ¶ 15. We have made it clear throughout our preinjury release jurisprudence, however, that contract cannot claim victory over tort in every instance. We have indicated that releases that are not sufficiently clear and unambiguous cannot be enforced. *Hawkins v. Peart,* 2001 UT 94, ¶ 9 n. 3, 37 P.3d 1062. We have also indicated that we would refuse to enforce releases that offend public policy. *Id.* ¶ 9. We do not explore the clarity with which Snowbird communicated to Mr. Rothstein its intention to release itself of liability for its negligence

because we conclude that the releases offend the public policy of this state as articulated by the Legislature.

¶ 7 We first insisted that preinjury releases be compatible with public policy a century ago when we affirmed Christine Pugmire's jury verdict awarding her damages for injuries she sustained when a locomotive ran into the railroad car in which she lived and worked as a cook.[2] *Pugmire v. Or. Short Line R.R. Co.,* 33 Utah 27, 92 P. 762, 763, 767 (1907). Mrs. Pugmire had signed a release absolving the railroad from liability for any injuries she might sustain. We affirmed the trial court's refusal to instruct the jury that Mrs. Pugmire could be bound by the release, noting that such master-servant agreements "are held to be void ... [because] they are against public policy." *Id.* at 765.

¶ 8 By the time it was adopted within the Restatement of Torts in 1965, the principle that the interests of public policy could supplant the interests of contract had acquired universal acceptance. *See, e.g., Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 90, 75 S.Ct. 629, 99 L.Ed. 911 (1955); *Am. S.S. Co. v. Great Lakes Towing Co.,* 333 F.2d 426, 428–29 (7th Cir.1964); *Mohawk Drilling Co. v. McCullough Tool Co.,* 271 F.2d 627, 633 (10th Cir.1959); *Gilpin v. Abraham,* 218 F.Supp. 414, 415 (E.D.Pa.1963). Section 496B of the Restatement (Second) of Torts states, "A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."[3] Restatement (Second) of Torts § 496B (1965).

2. Mrs. Pugmire worked in the railroad car with her husband. The defendant railroad attempted to escape liability by claiming that only Mr. Pugmire was its employee. (Of course, this case predated the enactment of Utah's Workers' Compensation Act by a decade.) In testimony that stands out as an artifact of a bygone era of gender roles, a railroad witness sabotaged this defense when he told the jury that Mr. Pugmire's duties included cooking for the train crew. As it happened, Mr. Pugmire could not cook, but "it was taken for granted that [Mrs. Pugmire] could cook and would assist in the work; and that was why the wife was permitted to go." *Pugmire v.*

*Or. Short Line R.R. Co.,* 33 Utah 27, 92 P. 762, 764 (1907) (internal quotation marks omitted).

3. This section of the Restatement is titled "Express Assumption of the Risk." Courts are wise to exercise caution whenever they encounter the term assumption of the risk. To many, it is a concept that had been wholly discredited with the arrival of comparative negligence. We spoke to the perils of falling prey to this overgeneralization in *Fordham v. Oldroyd,* 2007 UT 74, ¶¶ 9–14, 171 P.3d 411. Express assumption of the risk of the type addressed in section 496B is another species of the doctrine that coexists with compar-

¶ 9 Our recent encounters with preinjury releases have uniformly reaffirmed the public policy exception to the general rule that preinjury releases are enforceable. *See, e.g., Hawkins,* 2001 UT 94, ¶ 1, 37 P.3d 1062 (holding invalid as contrary to public policy a waiver of liability and an indemnity provision that an equestrian group required individuals to sign before riding horses).

¶ 10 Despite our willingness to invoke public policy as the justification for refusing to enforce certain preinjury releases, we are mindful of the caution with which we must proceed when contemplating this analytic approach. Ascertaining when a preinjury release sufficiently offends public policy to warrant stripping the release of its enforceability can be difficult. As the example of preinjury releases for negligence amply illustrates, the quest to identify good public policy in a particular instance often requires a court to account for two or more conflicting policies, each laudable, but none of whose claims on the good can be fully honored. Extracting public policy from statutes can be no less challenging. Moreover, in most instances, our proper role when confronted with a statute should be restricted to interpreting its meaning and application as revealed through its text. To pluck a principle of public policy from the text of a statute and to ground a decision of this court on that principle is to invite judicial mischief. Like its cousin legislative history, public policy is a protean substance that is too often easily shaped to satisfy the preferences of a judge rather than the will of the people or the intentions of the Legislature. We aptly noted the risks of relying on public policy rationales when we stated that " 'the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as a basis for judicial determinations, if at all, only with the utmost circumspection.' " *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1043 (Utah 1989) (quoting *Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 74 L.Ed. 854 (1930)). When, however, the Legislature clearly articulates public policy, and the implications of that public policy are unmistakable, we have the duty to honor those expressions of policy in our rulings. Such is the case here.

¶ 11 Seldom does a statute address directly the public policy relevant to the precise legal issue confronting a court. Here, no statute or other legislative pronouncement of public policy answers squarely the question of whether a preinjury release of a ski resort operator's negligence executed by a recreational skier is enforceable. Few legislative expressions of public policy speak more clearly to an issue, however, than the public policy rationale for Utah's Inherent Risks of Skiing Act, Utah Code Ann. §§ 78–27–51 to – 54 (2002 & Supp.2007), speaks to preinjury releases for negligence.

¶ 12 Our confidence in defining the public policy that the Act was created to serve is enhanced by the fortuitous fact that the Utah Legislature introduced the substantive text of the Act with a statement of public policy. Section 78–27–51 states:

The Legislature finds that the sport of skiing is practiced by a large number of residents of Utah and attracts a large number of nonresidents, significantly contributing to the economy of this state. It further finds that few insurance carriers are willing to provide liability insurance protection to ski area operators and that the premiums charged by those carriers have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing. It is the purpose of this act, therefore, to clarify the law in relation to skiing injuries and the risks inherent in that sport, to establish as a matter of law that certain risks are inherent in that sport, and to provide that, as a matter of public policy,

ative negligence. In *Jacobsen Construction Co. v. Structo–Lite Engineering, Inc.,* we noted,

An express assumption of risk involves a contractual provision in which a party expressly contracts not to sue for injury or loss which may thereafter be occasioned by the acts of another. We not only follow suit by refraining to include this form of assumption of risk in our discussion, but furthermore fail to see a necessity for including this form within assumption of risk terminology.
619 P.2d 306, 310 (Utah 1980).

no person engaged in that sport shall recover from a ski operator for injuries resulting from those inherent risks.

¶ 13 Read in its most restrictive sense, section 78–27–51 simply announces that it is the public policy of Utah to bar skiers from recovering from ski area operators for injuries resulting from the inherent risks of skiing, as enumerated in the Act. So limited, this pronouncement explains nothing that one could not deduce from the text of the Act itself which by its terms codifies this policy. Of equal or greater significance are legislative findings and expressions of public policy that bear on why it is important to identify the inherent risks of skiing and insulate ski area operators from liability for injury caused by them.

¶ 14 According to the Legislature, it was necessary to immunize ski area operators from liability for injuries caused by inherent risks because they were otherwise being denied insurance coverage or finding coverage too expensive to purchase. *See id.* The Legislature found that the ski industry insurance crisis imperiling the economic viability of ski area operators was more than an inconvenient product of market forces. It had become a matter of public policy concern meriting the intervention of public policy because, in the words of the Legislature, "the sport of skiing is practiced by a large number of residents of Utah and attracts a large number of nonresidents, significantly contributing to the economy of this state." *Id.* Thus, the ski industry's prominent role in Utah's economy justified, in the view of the Legislature, governmental intervention to ameliorate the untoward effects of the free market.

■ ¶ 15 The central purpose of the Act, then, was to permit ski area operators to purchase insurance at affordable rates. The insulation of ski area operators from liability for injuries caused by inherent risks of skiing was a means to that end. There is no evidence that, in the absence of a perceived insurance crisis, the Legislature would have interceded on behalf of ski area operators merely to clarify the scope of duties owed skiers who used the ski facilities. The Act is most clearly not, as Snowbird contends, intended to protect ski area operators by limiting their liability exposure generally. It is rather a statute that is intended to clarify those inherent risks of skiing to which liability will not attach so that ski resort operators may obtain insurance coverage to protect them from those risks that are not inherent to skiing.

¶ 16 By expressly designating a ski area operator's ability to acquire insurance at reasonable rates as the sole reason for bringing the Act into being, the Legislature authoritatively put to rest the question of whether ski area operators are at liberty to use preinjury releases to significantly pare back or even eliminate their need to purchase the very liability insurance the Act was designed to make affordable. They are not. The premise underlying legislative action to make insurance accessible to ski area operators is that once the Act made liability insurance affordable, ski areas would buy it to blunt the economic effects brought on by standing accountable for their negligent acts. The bargain struck by the Act is both simple and obvious from its public policy provision: ski area operators would be freed from liability for inherent risks of skiing so that they could continue to shoulder responsibility for noninherent risks by purchasing insurance. By extracting a preinjury release from Mr. Rothstein for liability due to their negligent acts, Snowbird breached this public policy bargain.

¶ 17 There is little to recommend Snowbird's rejoinder to this interpretation of the public policy provision of the Act. Snowbird contends that the purpose of the Act is to immunize ski area operators from liability generally. Since releases of liability also serve this end, Snowbird argues such releases are wholly compatible with the Act. This reasoning fails to account for the Legislature's inescapable public policy focus on insurance and ignores the reality that the Act's core purpose is not to advance the cause of insulating ski area operators from their negligence, but rather to make them better able to insure themselves against the risk of loss occasioned by their negligence.

¶ 18 The cases cited by Snowbird from other states that statutorily insulate the pro-

viders of recreational activities from liability for inherent risks and permit preinjury· releases lose their persuasive appeal on close examination. *Street v. Darwin Ranch, Inc.,* 75 F.Supp.2d 1296 (D.Wyo.1999); *Clanton v. United States,* 686 N.E.2d 896 (Ind.Ct.App. 1997). Neither Wyoming's Recreation Safety Act, Wyo. Stat. Ann. §§ 1–1–121 to –123 (1995), nor the relevant Indiana statute, Ind. Code § 14–22–10–2 (1995), that inform these cases contain public policy sections or discuss the issue of insurance. Although both statutes contemplate the lack of liability associated with a variety of recreational activities, neither contains the kind of resounding public policy pronouncement present in Utah's Act.

¶ 19 Likewise unavailing is Snowbird's assertion that the freedom to enter into a preinjury release must be preserved in the absence of express legislative disapproval. Were we to adopt this reasoning, we would call into question the legitimacy of the entire body of our preinjury release jurisprudence inasmuch as we have never declared a preinjury release unenforceable with the aid of an express statutory mandate to do so. Nor would we be likely to encounter such an occasion. In the face of an express legislative prohibition of a preinjury release, a public policy analysis would hardly be necessary. Moreover, the Act's expression of public policy does not lend itself to the need for an additional statement concerning the status of preinjury releases. The legislative goal expressed in the Act of easing the task of ski area operators to insure themselves against noninherent risks creates the presumption that ski area operators will confront those risks through insurance and not by extracting contractual releases from skiers. In this setting, the burden shifts to ski area operators to persuade the Legislature to expressly preserve their rights to obtain and enforce preinjury releases.

## CONCLUSION

¶ 20 Consistent with our duty to honor the Legislature's unambiguous expressions of public policy, we hold that the release and indemnify agreements Mr. Rothstein signed per Snowbird's request are contrary to the public policy of this state and are, therefore, unenforceable. We vacate the district court's grant of summary judgment and remand for proceedings consistent with this opinion.

¶ 21 Chief Justice DURHAM and Justice PARRISH concur in Justice NEHRING'S opinion.

WILKINS, Associate Chief Justice, dissenting:

¶ 22 I conclude that the preinjury releases at issue in this appeal are not, in and of themselves, contrary to the public policy of this state. Accordingly, I respectfully dissent from the majority opinion.

¶ 23 I agree with the majority that the central purpose of Utah's Inherent Risks of Skiing Act is to facilitate affordable insurance rates for ski area operators because of their direct impact on and contribution to the Utah economy. *See* Utah Code Ann. § 78–27–51 (2002 & Supp. 2007). I also agree that, in drafting the public policy statement that precedes the substantive text of the Act, the Legislature clearly intended to clarify the law and proscribe lawsuits against ski area operators for those risks that are inherent in skiing. My conformity with the majority opinion, however, ends there.

¶ 24 Grounding their reasoning in the "legislative findings and expressions of public policy [in the Act]," *supra* ¶ 13, the majority ultimately concludes that the Legislature has "authoritatively put to rest the question of whether ski area operators [may] use preinjury releases to significantly pare back or ... eliminate their need to purchase ... liability insurance.... They [may] not." *Supra* ¶ 16. In other words, the majority reasons that because encouraging affordable insurance rates is the primary objective of the Act, once ski area operators obtain that insurance they may do no more to protect themselves. Consequently, my colleagues conclude, it violates this express public policy for ski area operators to attempt to limit their liability by seeking preinjury releases from patrons. Extracting such releases, according to the majority, "breache[s the] public policy bargain" made by the Act. *Supra* ¶ 16. I disagree.

¶ 25 When deciding questions of statutory interpretation, we customarily look first to the plain language of a statute. It is also usual that we take note of words and phrases the Legislature did not include. *See Biddle v. Washington Terrace City,* 1999 UT 110, ¶ 14, 993 P.2d 875 ("[O]missions in statutory language should be taken note of and given effect." (citation and internal quotation marks omitted)). Similarly, we have previously expressed the view that "[this] court has no power to rewrite a statute to make it conform to an intention *not expressed.*" *Mountain States Tel. & Tel. Co. v. Pub. Serv. Comm'n,* 107 Utah 502, 155 P.2d 184, 185 (1945) (emphasis added).

¶ 26 In my view, the majority's interpretation improperly expands the plain language of the Act and infuses it with "intention not expressed" by the Legislature. *Id.* Section 78-27-51 simply proscribes lawsuits against ski area operators for those risks that are inherent to skiing. *See* Utah Code Ann. § 78-27-51. Nowhere does the text suggest that ski area operators may not contractually further limit their liability for risks that are not inherent to skiing. In fact, the text is silent about whether an individual may or may not sue a ski area operator on some other basis. Accordingly, this court should resist the temptation to add language or meaning to the Act where no hint of it exists in the text.

¶ 27 When the Legislature clearly identifies a public policy objective, we have a duty to honor it. We also have a duty, however, not to stray beyond the plain language of a statute, as I believe the majority has done here. I conclude that preinjury releases do not automatically violate the public policy of this state and that releases must be examined on an individual basis to determine whether they are enforceable under the applicable law. Where, as here, neither preinjury release executed by the plaintiff was a requirement to using the ski area but instead granted additional benefits and privileges to the skier, both parties should be free to enter into the agreement, or not, and expect it to be enforced by our courts as agreed. Accordingly, I would affirm the district court's grant of summary judgment in favor of Snowbird.

¶ 28 Justice DURRANT concurs in Associate Chief Justice WILKINS'S dissenting opinion.