2011 UT App 183

Lisa PENUNURI and Barry Siegwart,
Plaintiffs and Appellants,

v.

SUNDANCE PARTNERS, LTD.; Sundance Holdings, LLC; Sundance Development Corp.; Robert Redford; Robert Redford 1970 Trust; and Rocky Mountain Outfitters, LC, Defendants and Appellees.

No. 20100331–CA.

Court of Appeals of Utah.

June 9, 2011.

Robert D. Strieper, Salt Lake City, for Appellants.

H. Burt Ringwood and A. Joseph Sano, Salt Lake City, for Appellees.

Before Judges DAVIS, VOROS, and CHRISTIANSEN.

## OPINION

VOROS, Judge:

¶ 1 Lisa Penunuri appeals the trial court's order denying her Motion for Partial Summary Judgment against Sundance Partners, LTD, and other named appellees (collectively, Sundance) and dismissing as a matter of law her claims based on ordinary negligence. We affirm.

## BACKGROUND

¶ 2 On August 1, 2007, Penunuri and two friends participated in a guided horseback ride operated by Sundance. The party consisted of five riders and one guide. The riders were arrayed in single file with the guide in front and Penunuri in the rear. The rider directly in front of Penunuri was an eight-year-old girl. The girl had problems controlling her horse; as a result, gaps formed in the train of riders. To keep the train together, the guide informed the riders that she would hold the reins of the eight-year-old's horse. However, before the guide could do so, Penunuri's horse suddenly accelerated to catch up with the other horses. The unexpected acceleration allegedly caused Penunuri to fall off her horse and suffer serious injuries. Sundance's instructional manual for horseback riding guides cautioned that horses that lag behind tend to accelerate quickly to catch up with the group.

¶ 3 Before participating in the ride, Penunuri signed a Release & Indemnity Agreement (the Release), which purported to release Sundance from any claims arising from its ordinary negligence:

> I expressly agree to assume all risks of personal injury, falls, accidents, and/or property damage, including those resulting from any negligence of Sundance. . . .

¶ 4 Penunuri filed suit against Sundance alleging negligence, gross negligence, and vicarious liability. She then filed a Motion and Memorandum for Partial Summary Judgment and Declaratory Relief, arguing that the Release is unenforceable under the Limitations on Liability for Equine and Livestock Activities Act (the Equine Act), *see* Utah Code Ann. §§ 78B–4–201 to –203 (2008). The trial court ruled that the Equine Act did

not prevent a party from contracting away its liability for ordinary negligence and thus ruled the Release enforceable. It accordingly dismissed all of Penunuri's claims based on ordinary negligence. ` Penunuri appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 5 Penunuri contends that the trial court erred by denying her motion for partial summary judgment and by ruling that the Release was enforceable. More specifically, she argues that the plain language of the Equine Act prevents an equine sponsor from limiting its liability for ordinary negligence with a pre-injury release. In addition, she argues that public policy as expressed in the Equine Act prohibits such releases.

¶ 6 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We "review[ ] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[ ] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730. In addition, "[w]e review questions of statutory interpretation for correctness giving no deference to the trial court's interpretation." *In re S.C.*, 1999 UT App 251, ¶ 8, 987 P.2d 611 (internal quotation marks omitted).

## ANALYSIS

¶ 7 "In general, the common law disfavors agreements that indemnify parties against their own negligence because one might be careless of another's life and limb, if there is no penalty for carelessness." *Hawkins v. Peart*, 2001 UT 94, ¶ 14, 37 P.3d 1062 (internal quotation marks omitted). Nevertheless, generally, "those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of [a] contractual duty; but such an exemption is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence." *Id.* ¶ 9 (quoting 6A Arthur Linton Corbin, *Corbin on Contracts*, § 1472, at 596–97 (1962)). Thus, in Utah, as in a majority of states, generally "people may contract away their rights to recover in tort for damages caused by the ordinary negligence of others." *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 14, 179 P.3d 760; *see also Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 6, 175 P.3d 560 ("We have joined the majority of jurisdictions in permitting people to surrender their rights to recover in tort for the negligence of others.").

¶ 8 Penunuri first contends that the plain language of the Equine Act renders the Release unenforceable. She also contends that the Release offends public policy established by the Equine Act. We consider each contention in turn.

A. The Language of the Equine Act Does Not Invalidate the Release.

¶ 9 "To interpret a statute, we always look first to the statute's plain language in an effort to give effect to the legislature's intent, to the degree it can be so discerned." *In re Olympus Constr., LC*, 2009 UT 29, ¶ 10, 215 P.3d 129. To determine the meaning of the plain language, we examine the statute "in harmony with other statutes in the same chapter and related chapters." *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (internal quotation marks omitted). Moreover, " 'effect must be given, if possible, to every word, clause and sentence of a statute.... No clause[,] sentence or word shall be construed as superfluous, void or insignificant if the construction can be found which will give force to and preserve all the words of the statute.' " *State v. Maestas*, 2002 UT 123, ¶ 53, 63 P.3d 621 (omission and alteration in original) (quoting 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:06 (4th ed. 1984)).

¶ 10 Penunuri contends that the Release violates the express terms of the Equine Act. Section 202 of the Equine Act shields an equine sponsor from liability for the inherent risks associated with equine activities, unless the sponsor engages in negligence, gross negligence, willful or wanton disregard for the safety of the participant, or intentionally injurious conduct:

An equine activity sponsor, equine professional, livestock activity sponsor, or livestock professional is not liable for an injury to or the death of a participant due to the inherent risks associated with these activities, *unless* the sponsor or professional:

(a)(i) provided the equipment or tack;

(ii) the equipment or tack caused the injury; and

(iii) the equipment failure was due to the sponsor's or professional's negligence;

(b) failed to make reasonable efforts to determine whether the equine or livestock could behave in a manner consistent with the activity with the participant;

(c) owns, leases, rents, or is in legal possession and control of land or facilities upon which the participant sustained injuries because of a dangerous condition which was known to or should have been known to the sponsor or professional and for which warning signs have not been conspicuously posted;

(d)(i) commits an act or omission that constitutes negligence, gross negligence, or willful or wanton disregard for the safety of the participant; and

(ii) that act or omission causes the injury; or

(e) intentionally injures or causes the injury to the participant.

Utah Code Ann. § 78B–4–202(2) (2008) (emphasis added).[1]

¶ 11 Penunuri argues that the "plain language provides that [Sundance] is not to be held liable for inherent risks associated with equine activity yet *must* be held liable for its acts or omissions of negligence." (Emphasis added.) She further argues that enforcing the Release "would make everything after 'unless' in [section 202(2)] superfluous." Sundance responds that while the Act is designed to ensure that equine activity sponsors would not be liable for specified inherent

risks, "nothing in the Act suggests that the Legislature intended to change or alter the liability of equine sponsors for noninherent risks or the contractual protections that might be afforded to them through a release." As noted above, Utah case law recognizes that pre-injury releases releasing a party from liability for its own negligence are generally enforceable. Thus, in effect, Penunuri asks us to read section 202 to overrule that case law insofar as equine and livestock activities are concerned.

¶ 12 The principal obstacle to reading section 202 to invalidate pre-injury releases is that it does not mention releases.[2] Accordingly, if section 202 invalidates pre-injury releases, it does so by implication only. As it applies to this case, section 202 is clear that an equine activity sponsor is protected from liability for the injury or death of a participant due to the inherent risks of equine activity *unless* the sponsor is negligent, grossly negligent, or worse. But what then? According to Penunuri, once negligence is established, the Equine Act mandates liability, subject only to statutory defenses. According to Sundance, once negligence is established, the Equine Act ceases to apply, and the case becomes a garden variety negligence case controlled by the rules governing such cases, including common law defenses.

¶ 13 Reading this language to abrogate common law defenses, invalidate pre-injury releases, and mandate liability stretches the statutory language past its plain meaning. We agree with Sundance and the trial court that section 202 protects a sponsor from liability arising from the inherent risks of equine activities unless the sponsor is negligent, in which case it offers no protection. However, the sponsor remains free to assert all other applicable defenses, including, if appropriate, release. The "unless" clause thus defines the limit of the Act's benefits to sponsors; it does not impose new burdens upon them. The Equine Act there-

---

1. This section was renumbered and amended after the instant case arose, but the relevant portions have not changed. *See* Utah Code Ann. § 78B–4–202 amend. notes (2008). We cite to the current version of the statute for the reader's convenience.

2. The same is true of the legislative history to which Penunuri directs our attention.

fore leaves undisturbed case law permitting sponsors to contractually limit their liability for acts of ordinary negligence. *See generally Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 904 (Utah Ct.App.1995) ("Generally, parties ... may properly bargain against liability from harm caused by their ordinary negligence."). This reading does not render the language following "unless" superfluous, as Penunuri argues. That language is still given its desired effect, which is to circumscribe the protections offered by the Equine Act.[3]

¶ 14 Thus construed, section 202 is in harmony with section 203 of the Equine Act. *See LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (stating that statutes are to be read in harmony with other statutes in the same chapter). Section 203 requires equine or livestock activity sponsors to provide notice to participants that the sponsor is not liable for certain inherent risks of the equine activity. *See* Utah Code Ann. § 78B–4–203(1) (2008). This notice may be provided by posting a sign in a prominent location or by "providing a document or *release* for the participant ... to sign." *Id.* § 78B–4–203(2)(b) (emphasis added). We do not read the word "release" in this section to refer merely to a document notifying the participant that the sponsor is insulated against claims arising from certain inherent risks of participating in the activity. Because the statutory term "document" already conveys this meaning, such a reading would impermissibly render "release" redundant. *See State v. Maestas*, 2002 UT 123, ¶ 53, 63 P.3d 621. Furthermore, a release does more than provide notice. "The main purpose of a release typically is the voluntary relinquishment of a claim or right by one who, absent the release, could have enforced such a claim or right." 66 Am.Jur.2d *Releases* § 1 (2010). We therefore conclude that section 203 presupposes the continued use of releases between equine activity sponsors and partici-

pants. Given the other provisions of the statute, a release in this context can have only one purpose, which is to release in advance a sponsor from liability for that sponsor's ordinary negligence. Accordingly, we conclude that the plain language of the Equine Act does not invalidate the Release.

B. Public Policy as Expressed in the Equine Act Does Not Invalidate the Release.

¶ 15 Penunuri next contends that the Release violates public policy as expressed in the Equine Act.[4] It is well settled that "preinjury releases must be compatible with public policy." *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 15, 179 P.3d 760. However, we proceed with great caution when considering whether to invoke public policy as a basis for judicial determinations:

> [P]ublic policy is a protean substance that is too often easily shaped to satisfy the preferences of a judge rather than the will of the people or the intentions of the Legislature.... [T]he theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as a basis for judicial determinations, if at all, only with the utmost circumspection.

*Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 10, 175 P.3d 560 (internal quotation marks omitted); *see also Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 672 (Tex.2008) ("[P]ublic policy ... is a very unruly horse, and when once you get astride it you never know where it will carry you." (quoting *Richardson v. Mellish*, (1824) 2 Bing. 229, 252, 130 Eng. Rep. 294, 303)). "For a contract to be void on the basis of public policy, there must be a showing free from doubt that a contract is against public policy." *Ockey v. Lehmer*, 2008 UT 37, ¶ 21,

---

3. Because our supreme court has declined—albeit in a noncommercial setting—to "extend strict liability to owners and keepers of horses," *see Pullan v. Steinmetz*, 2000 UT 103, ¶ 7, 16 P.3d 1245, one might question whether the negligence exception to the Equine Act's coverage circumscribes its protections to the point of rendering them illusory.

4. Penunuri does not argue that the Release violates public policy under the so-called *Tunkl* standard. *See generally Hawkins v. Peart*, 2001 UT 94, ¶ 9 n. 3, 37 P.3d 1062 (discussing the public policy standard set forth in *Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445–46 (1963)).

189 P.3d 51 (internal quotation marks omitted).

¶ 16 Generally, "our public policy does not foreclose the opportunity of parties to bargain for the waiver of tort claims based on ordinary negligence." *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 15, 171 P.3d 442. However, Penunuri argues that the Equine Act establishes a public policy prohibiting an equine sponsor from limiting its liability for negligence via a pre-injury release. She analogizes to the Utah Supreme Court's invalidation of a pre-injury release based on public policy grounds under Utah's Inherent Risks of Skiing Act (the Skiing Act). *See generally Rothstein*, 2007 UT 96, 175 P.3d 560; Utah Code Ann. §§ 78–27–51 to –54 (2002 & Supp.2007).

¶ 17 In *Rothstein v. Snowbird Corp.*, 2007 UT 96, 175 P.3d 560, a skier collided with a retaining wall and was injured. *See id.* ¶ 1. He sued the ski resort, alleging negligence. *See id.* The trial court granted the ski resort's motion for summary judgment based on two release and indemnity agreements signed by the skier. *See id.* ¶ 5. The agreements provided that the skier waived all claims, "including those caused by [the resort's] negligence." *Id.* ¶ 4. The supreme court reversed in a 3–2 decision, holding that the releases violated public policy as declared in the Skiing Act. *See id.* ¶ 1.

¶ 18 The first section of the Skiing Act contains an extensive statement of its public policy underpinnings:

"The Legislature finds that the sport of skiing is practiced by a large number of residents of Utah and attracts a large number of nonresidents, significantly contributing to the economy of this state. It further finds that few insurance carriers are willing to provide liability insurance protection to ski area operators and that the premiums charged by those carriers have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing. It is the purpose of this act, therefore, to clarify the law in relation to skiing injuries and the risks inherent in that sport, to establish as a matter of law that certain risks are inherent in that sport, and to

provide that, as a matter of public policy, no person engaged in that sport shall recover from a ski operator for injuries resulting from those inherent risks."

*Id.* ¶ 12 (quoting Utah Code Ann. § 78–27–51 (2002 & Supp.2007)). Based on that public policy statement, the *Rothstein* court observed that the Legislature found it "necessary to immunize ski area operators from liability for injuries caused by inherent risks because they were otherwise being denied insurance coverage or finding coverage too expensive to purchase." *Id.* ¶ 14. The court thus reasoned that "[t]he central purpose of the [Skiing] Act ... was to permit ski area operators to purchase insurance at affordable rates." *Id.* ¶ 15. A public policy "bargain [was] struck by the [Skiing] Act," the court held, which provided that "ski area operators would be freed from liability for inherent risks of skiing so that they could continue to shoulder responsibility for noninherent risks by purchasing insurance." *Id.* ¶ 16. Because the purpose of the Skiing Act was to provide ski resorts with the ability to purchase affordable liability insurance, the court held that the Legislature had determined that ski resorts could not "use pre-injury releases to significantly pare back or even eliminate their need to purchase the very liability insurance the [Skiing] Act was designed to make affordable." *Id.* Accordingly, the court held that the releases offended public policy. *See id.*

¶ 19 Penunuri argues that the Equine Act "was intended to mirror" the Skiing Act and that the two acts are "nearly identical." She argues, therefore, that the Equine Act struck the same bargain as the Skiing Act and thus prohibits pre-injury releases for negligence. Penunuri points out that both statutes "limit participants from recovering from inherent risks of the sport. Both define the inherent risks as those that are integral to the sport. Both acts require that the operator or sponsor post a sign listing the inherent risks. Both acts permit a participant to recover from acts of the sponsor or operator's negligence." Notwithstanding those similarities, however, only the Skiing Act includes a declaration of public policy. That public policy declaration was

the centerpiece of *Rothstein*. From it, the supreme court gleaned "[t]he central purpose of the [Skiing] Act," *id.* ¶ 15, and extrapolated "the bargain struck by the [Skiing] Act," *id.* ¶ 16, which supported its ultimate holding that Snowbird's releases were invalid. *See id.* "Few legislative expressions of public policy speak more clearly to an issue," the court noted, "than the public policy rationale for Utah's ... Skiing Act speaks to preinjury releases for negligence." *Id.* ¶ 11. The Equine Act has no equivalent statement of public policy. In fact, it has no statement of public policy at all. We are instead left with only the text of the Equine Act from which to deduce a public policy. *Rothstein* itself warns that "[t]o pluck a principle of public policy from the text of a statute and to ground a decision of this court on that principle is to invite judicial mischief." *Id.* ¶ 10. Consequently, we decline to do so.[5]

## CONCLUSION

¶ 20 The plain language of the Equine Act provides statutory protection to equine sponsors for inherent risks of equine activities. The portion of the Equine Act excluding negligent, gross negligent, and intentional acts from its protection does not invalidate pre-injury releases of ordinary negligence. In addition, while the Equine Act and the Skiing Act share a number of similarities, only the latter features a declaration of public policy. Accordingly, while the supreme court in *Rothstein* had a basis in the Skiing Act to invalidate pre-injury releases, we see no equivalent basis in the Equine Act for doing the same.

¶ 21 Affirmed.

¶ 22 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and MICHELE M. CHRISTIANSEN, Judge.

---

**5.** In *Street v. Darwin Ranch, Inc.*, 75 F.Supp.2d 1296 (D.C.Wyo.1999), a rider suing a dude ranch for a fall from a horse on a trail ride sought to invalidate a pre-injury release based on the Wyoming Recreation Safety Act. *See id.* at 1297. Similar to the Equine Act, the Wyoming Recreation Safety Act shields providers of recreational activities from claims based on the inherent risks of those activities. *See id.* (citing Wyo. Stat. Ann. § 1–1–123 (1999)). The court concluded, "The Release is, at the very least, consistent with the public policy expressed by the Act, if not in furtherance of it." *Id.* at 1300–01.